## FLETCHER *v.* FULLER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF RHODE ISLAND.

Argued January 18, 19, 1887. — Decided March 7, 1887.

Defendants in ejectment having produced a regular chain of title under a deed from a grandson of the original owner of a lot in Rhode Island, including the land in controversy, which was executed in 1768 and recorded soon afterwards in the land records of the town in which it was situated; and having shown that the ancestors in title paid the taxes on said lot for twenty years preceding 1805, and that afterward, up to the trial of the action in 1882, a period of seventy-seven years, they or their ancestors in title had uninterruptedly paid the taxes on the lot; and having shown an entry in 1835 by their ancestor upon the lot under a deed, for the purpose of quarrying a ledge of rock running through it, and the quarrying of the ledge with occasional intervals from 1846 to the commencement of this action in 1874, a period of twenty-eight years, the said entry being made with claim of title to the whole lot. *Held*, in an action brought by the heirs of the devisee of the original proprietor, under a will executed in 1749, and probated in 1756, none of whom had made any claim to the premises for three quarters of a century after the death of the original proprietor, under whose will they now assert title, nor paid taxes on the property, nor after that time ever taken possession of the premises or paid taxes upon them, that the jury might presume a deed to the grandson from the original proprietor, or from his devisee, to quiet the possession of the defendants claiming under such grandson; and that in making such presumption the jury were not to be restricted to consideration of,

what they fairly supposed actually occurred, but to what may have occurred, and seems requisite to quiet title in the possessors. It is sufficient that, the evidence leads to the conclusion, that the deed might have been executed, and that its execution would be a solution of difficulties arising from its non-execution.

Though a presumption of a deed may be rebutted by proof of facts inconsistent with its supposed existence, yet, where no such facts are shown, and the things done and the things omitted, with regard to the property in controversy, by the respective parties, for long periods of time after the execution of the supposed conveyance, can be explained satisfactorily only upon the hypothesis of its existence, the jury may be instructed that it is their duty to presume such a conveyance, and thus quiet the possession.

Though as a general rule, it is only where the possession has been actual, open, and exclusive for the period prescribed by the statute of limitations to bar an action for the recovery of land, that the presumption of a deed can be invoked; yet that presumption may properly be invoked where a proprietary right has been exercised beyond such statutory period, although the exclusive possession of the whole property, to which the right is asserted, may have been occasionally interrupted during such period if, in addition to the actual possession, there have been other open acts of ownership.

The assessment of taxes on an entire parcel of real estate to the person in possession under claim of title, and to his ancestors and privies in estate, for over a hundred years, is powerful evidence of a claim of right to the whole lot: and, taken in connection with the exclusive working of a quarry on the estate for more than twenty years under claim of title to the whole tract, by virtue of conveyances in which it was described, may authorize a jury to infer continuous possession of the whole, notwithstanding a temporary and occasional intrusion by others upon a different part of the tract, which did not interfere with the work.

EJECTMENT for a tract of land in Rhode Island. Verdict for plaintiff, and judgment on the verdict. Defendants sued out this writ of error. The case is stated in the opinion of the court.

*Mr. William H. Greene* and *Mr. James Tillinghast* (*Mr. Charles Hart* was with them on the brief) for plaintiffs in error cited: *Lehigh Valley Railroad* v. *McFarlan*, 43 N. J. Law, 605; *Hillary* v. *Waller*, 12 Ves. 239, 252; *Casey's Lessee* v. *Inloes*, 1 Gill 430, 503 [*S. C.* 39 Am. Dec. 658]; *Sumner* v. *Child*, 2 Conn. 607; *Williams* v. *Donell*, 2 Head, 695; *Coolidge* v. *Learned*, 8 Pick. 504; *Durant* v. *Ritchie*, 4 Mason, 45; *Clarke* v. *Cross*, 2 R. I. 440; *Beckford* v. *Wade*, 17 Ves.

87; *Union Savings Bank* v. *Taber*, 13 R. I. 683; *United States* v. *Dickson*, 15 Pet. 141; *Mowry* v. *Providence*, 10 R. I. 52; *Ewing* v. *Burnet*, 11 Pet. 41; *Sailor* v. *Hertzogg*, 10 Penn. St. 296; *Farrar* v. *Fessenden*, 39 N. H. 268; *Little* v. *Downing*, 37 N. H. 355; *Webb* v. *Richardson*, 42 Vt. 465, 474; *Paine* v. *Hutchins*, 49 Vt. 314; *St. Louis Public Schools* v. *Risley's Heirs*, 40 Missouri, 356, 370; *Davis* v. *Easley*, 13 Ill. 192; *Elwell* v. *Hinckley*, 138 Mass. 225; *Glascock* v. *Hughes*, 55 Texas, 461; *Ricard* v. *Williams*, 7 Wheat. 59, 105; *Cheney* v. *Watkins*, 1 Harr. & Johns. 527 [*S. C.* 2 Am. Dec. 530]; *Draper* v. *Shoot*, 25 Missouri, 197 [*S. C.* 69 Am. Dec. 462]; *Tingley* v. *Providence*, 8 R. I. 493; *McClung* v. *Ross*, 5 Wheat. 116; *Campbell* v. *Point Street Iron Works*, 12 R. I. 452; *Burdick* v. *Burdick*, 15 R. I. 574.

*Mr. Livingston Scott* and *Mr. Elisha C. Mowry* (*Mr. James C. Collins* was with them on the brief) for defendant in error cited, to the points decided by the court: *Dwyer* v. *Dunbar*, 5 Wall. 318; *Burrell* v. *State*, 18 Texas, 713–733; *Rivière* v. *McCormick*, 14 La. Ann. 139; *Laber* v. *Cooper*, 7 Wall. 565; *Jackson* v. *Haviland*, 13 Johns. 229; *Hamet* v. *Dundass*, 4 Penn. St. 178; *Taylor's Devisees* v. *Burnside*, 1 Gratt. 165, 211; *Jackson* v. *Myers*, 3 Johns. 383, 392, 393 [*S. C.* 3 Am. Dec. 504]; *Ewing* v. *Burnet*, 1 McLean, 266; *Sorber* v. *Willing*, 10 Watts, 141; *Hockenbury* v. *Snyder*, 2 W. & S. 240; *Cornelius* v. *Giberson*, 1 Dutcher, 1; *Reed* v. *Field*, 15 Vt. 672; *Little* v. *Megquier*, 2 Greenl. 176; *Clarke* v. *Cross*, 2 R. I. 440; *Hurst* v. *McNeil*, 1 Wash. C. C. 70; *Ricard* v. *Williams*, 7 Wheat. 59, 108; *Anonymous*, 1 Salk. 246; *Barr* v. *Gratz*, 1 Wheat. 213; *Smith* v. *Burtis*, 6 Johns. 197 [*S. C.* 5 Am. Dec. 218]; *Codman* v. *Winslow*, 10 Mass. 146; *Brimmer* v. *Proprietors of Long Wharf*, 5 Pick. 131; *Henderson* v. *Griffin*, 5 Pet. 151; *Holtzapple* v. *Phillburn*, 4 Wash. C. C. 356; *O'Hara* v. *Richardson*, 46 Penn. St. 385; *Altemas* v. *Campbell*, 9 Watts, 28; [*S. C.* 34 Am. Dec. 494]; *Burrows* v. *Gallup*, 32 Conn. 493; *Peabody* v. *Hewitt*, 52 Maine, 33 [*S. C.* 83 Am. Dec. 486]; *Means* v. *Welles*, 12 Met. (Mass.) 356; *Brickett* v. *Spofford*, 14 Gray, 514; *Rogers* v. *Benlow*, 10 S. & R. 306; *Robison* v. *Swett*, 3 Greenl. 316.

Mr. Justice Field delivered the opinion of the court.

This is an action of ejectment to recover possession of twenty-seven twenty-eighths undivided parts of a tract of land, containing about fourteen acres, situated in the town of Lincoln, formerly Smithfield, in the state of Rhode Island. The plaintiff, a citizen of Connecticut, sues the defendants, citizens of Rhode Island, in his own right and as trustee for others.

The declaration contains several counts, all of which except two are withdrawn. In these the plaintiff alleges that on the 25th of October, 1874, he was "seized and possessed in his demesne as of fee in his own right and as trustee" of twenty-seven twenty-eighths undivided parts of the tract of land which is described, and that the defendants on that day and year, with force and arms, entered thereon and ejected him therefrom, and have ever since withheld the possession, to his damage of one thousand dollars. The two counts differ merely in the description of some of the boundary lines of the tract. The defendants pleaded the general issue and twenty years' possession under the statute of possessions. Upon these pleas issues were joined and the case was tried, the parties stipulating that the plea of the statute should be held to apply to any period or periods of twenty years that could be covered by any other like plea that might have been filed, and that either party might offer any evidence and rely upon any matters that would be admissible under such plea or pleas, and any proper replications or other proceedings thereon. The case was tried three times, resulting the first time in a verdict for the defendants, and at the other times in a verdict for the plaintiff. The judgment on the last verdict is brought before us for review by the defendants on a writ of error. Numerous exceptions were taken in the progress of the trial to the rulings of the court in the admission and rejection of evidence, and to the instructions given and refused to the jury. But the conclusions we have reached with respect to the instructions given and refused as to the presumption of a deed to the ancestors in title of the defendants, render it unnecessary to consider the others.

Opinion of the Court.

It appears from the evidence at the trial that the land in controversy was the westerly part of a tract of 33¾ acres, belonging, in 1750, to one James Reed, and which, by early conveyances, became divided into three parcels, one containing 22¼ acres, one 5½ acres, and the third 6 acres, as shown by a diagram submitted, by consent of parties, to the jury, of which the following is a reduced copy:

A turnpike; running through the tract. northerly and. southerly, was opened in 1816.  The 22¼-acre parcel was conveyed to Francis Richardson, of Attleboro, Massachusetts, by deed dated April 10, 1750. · The land in controversy is a portion of this parcel lying west of the turnpike.  The 5½-acre parcel was .conveyed to Ezekiel Fuller by deed dated November 17, 1750. The 6-acre parcel was conveyed to Abigail Fuller, · wife of Ezekiel, and daughter of Francis Richardson, by deed dated January 21, 1756.

The plaintiff claims to derive title under the will of ·Francis Richardson dated May 26, 1749, and the codicil thereof dated .August 10, 1750, which were admitted to probate in Massachusetts, January 19, 1756.  A copy of the will and codicil, and of the Massachusetts probate, was produced and given in evidence, together with a certificate of their having been filed . and recorded in the probate office in Lincoln on the 27th of August, 1881. ·

It does not appear that there was any direct evidence that' Francis Richardson was seized of the 22¼-acre parcel at the time of his death.  The presumption, in the absence of any opposing circumstances, is undoubtedly that, being the owner at the date of the codicil, August 10, 1750, he continued such owner up to the time of his death, which occurred some years afterwards.  Whether·sufficient opposing circumstances to rebut this presumption are found in the absence of all claim to the. land for three quarters of a century by the devisee or her husband, or her heirs, and the continued claim of ownership by the ancestors in title of the defendants during that period, is a question to be hereafter considered.

It is stated in the record that there was evidence tending .to show that Abigail Fuller, the devisee, and her husband entered into possession of the property devised under the will and codicil, but what that evidence was does not appear. · Abigail died prior to 1766, leaving her husband surviving her. He left Smithfield sometime in 1761 "for parts unknown." It appears also that in a deed executed ·by him on the 11th of April, 1761, of the 20-acre lot designated on the diagram, he. recited that such lot was bounded on the north by "his former land."

With the exception of the evidence tending to show that the devisee and her husband entered into possession of the property devised, and the reference by the husband in his deed to the tract as his former land, there was nothing to show that any claim of right or title to the land had been made by them, or by their heirs, for nearly three quarters of a century, either by the exercise of acts of ownership over it, such as its occupation or the use of its products, or by leasing or selling it, or by the payment of taxes or in any other way. And for over forty years after the lapse of the three quarters of a century, the only claim of title made by the heirs of the devisee to any portion of the 22¼-acre lot consisted in the fact that in 1835 they brought an action against certain persons with whom the defendants were not in privity of title or ancestry, for the recovery of another portion of the 22¼-acre parcel, which action was discontinued in 1838 on account of the poverty and pecuniary inability of the heirs to carry it on; and in the fact that, at varying intervals between 1826 and 1857 (not 18ᵏ8, as stated in one part of the record) they had been in the habit, under such claim, of cutting wood thereon openly for family use, and the manufacture of baskets, in which business some of them were engaged, and carrying it to their homes; and that on three occasions, once in 1840, once in 1845, and once in 1852, some of them, in contemplation of taking legal proceedings to establish their title, had gone around and upon the land and pointed out its boundaries.

When Ezekiel Fuller departed from Smithfield in 1761, he left two children, Francis and Abigail, without means of support, and at a meeting of the town council in September following, proceedings were taken to provide for them. In a resolution reciting that "Ezekiel is gone, we know not where;" that his children were then and likely to be chargeable to the town, that little or nothing of Ezekiel's estate was to be found to support them, but that it was assumed there was some estate belonging to him, a person was appointed to make proper inquiry and search for it, "to know what land there is belonging to the family of said Ezekiel and secure the same for the support of the children." It would seem that the person, thus

appointed, reported that there was a piece of land — a six-acre parcel — which was possessed by Ezekiel in right of his wife, for the town council, at a meeting in March, 1776, after reciting that there was nothing of said Fuller's estate left behind to maintain his children but a small piece of land, and that no provision for their support could be had without the favor and authority of the General Assembly to sell and give a deed of it, appointed one Edward Mowry to lay the matter before the Assembly and request that it would pass an act to enable some proper person to dispose of the parcel, and clothe him with authority to give a deed thereof. Mowry presented a proper petition to the Assembly, which granted the prayer, and empowered the town treasurer, with the consent and advice of the town council, to sell the land and apply the money received for the purpose stated, that is, the support of the children. A sale of the six-acre lot for thirty pounds was accordingly made by the town treasurer under the authority thus conferred.

Abigail, the wife of Ezekiel, left five children surviving her, all of whom died before their father except Abigail, Jr., who was one of the two supported by the town. The father, who disappeared from Smithfield in 1761, died in the poor-house in Attleboro, Massachusetts, in 1800. Abigail, the daughter, was born December 29, 1757, became of age December 29, 1778, and was married to Benjamin Fuller December 1, 1779. He died in 1832, and she died in 1835, intestate. The plaintiff is the grandson of this Abigail, and the parties for whom he is trustee are her other descendants. They all derive whatever title they have from her.

On the 24th of May, 1874, a century and eighteen years after the probate of the will of Francis Richardson, all the heirs of Abigail Fuller, except one, executed a power of attorney to Theodore C. Fuller, also one of said heirs, authorizing him to sell to Nathan Fuller, the plaintiff in this action, all their title and interest in the tract conveyed by James Reed to Francis Richardson by deed dated April 10, 1750, and devised to Elizabeth Fuller, wife of Ezekiel, by his last will and testament probated January 19, 1756, to hold the same upon trust to

prosecute to final conclusion legal proceedings necessary to re-
cover· possession of the premises, to employ counsel for that
purpose, to conduct the proceedings, and to make such com-
promises of the grantors' claims as to him and his counsel
might seem best.

.The same grantors, by their attorney, on the same day, exe-
cuted a deed of the same·tract ·of land to ·Nathan Fuller,
reciting a consideration of ten dollars, upon trusts similar to
those contained in the power of attorney. Both documents were
duly acknowledged by the grantors. The delivery of the deed
was made by the attorney in this way.· He and the grantee
went upon the land with three other persons, and whilst upon
it he delivered the deed to the grantee. He also took up some
earth in his hands and passed it to the grantee. This he had
been instructed to do by his counsel as the form of delivering
possession. The parties were about fifteen minutes on the
land. There was no evidence of any notice to or· knowledge
by the defendants of these acts, and they testified that they
had neither. This is the case of the plaintiff briefly stated.

The defendants trace their title to the land in question by
continuous claim of title from a deed of the 22¼-acre parcel
made by one Jeremiah Richardson, a grandson of the testator,
Francis Richardson, to Stephen Jencks, dated April 8, 1768,
containing full covenants of title and warranty, and recorded
in the records of Smithfield on July 10, following. Jeremiah
Richardson was the son of Francis Richardson, who was a son
of. the testator, and is named in the will as having died. Jer-
emiah had a brother, also called Francis Richardson, who died
prior to March, 1766. Stephen Jencks, by deed dated August
12, 1796, containing full covenants of warranty, to secure sev-
eral notes, amounting to $3000, mortgaged the land in con-
troversy, with adjoining lands to which he had acquired title,
making in all 50 acres; of which the 20-acre lot, designated on
the diagram, was one parcel, which he had purchased in 1763
for £640, and the six-acre lot, also designated on the diagram,
was another parcel, which he had purchased in 1768 for
£45. He died in 1800, leaving a will, by which he devised
his real estate in Smithfield and·elsewhere to his children.

Stephen Jencks, Jr., his son, acquired the interests of the other
heirs, and by deed dated May 18, 1804, conveyed the whole,
including by specific description the land in controversy, to
his brother, Jerahmael Jencks, who was the grandfather and
ancestor in title of the defendants.    Other portions of the 22¼-
acre parcel were conveyed by ancestors in title of the defend-
ants, by deeds to different parties, containing full covenants of
title and warranty, dated respectively April 12, 1841, Decem-
ber 3, 1845, and May 21, 1860, and they entered into posses-
sion of the respective parcels, and enclosed and improved
them.    In May, 1864, the father of the defendants, from whom
they derive their title, surveyed and plotted into town lots the
remaining portion of that parcel, being the land in contro-
versy.    In the partition of the estate of the grandfather, Jer-
ahmael Jencks, between his heirs-at-law, in 1824, this land had
been taken by him as part of his estate, and plotted as such in
the partition plot.    He died in 1866.

The land was not enclosed on the line of the turnpike.    In
1838 a fence was put up on the westerly side by an adjoining
owner.    On the southerly side there was at one time a fence
running from the turnpike westerly to the other side of the
ledge hereafter mentioned, but it disappeared in 1835.    On
the northerly line there was only a brush fence until 1867,
when a purchaser of adjoining land erected one.    The land has
never been put under cultivation.    Prior to 1858 it was cov-
ered with wood; and every year from 1829 to 1857 the ances-
tors of the defendants cut wood upon it for family use.    In
1857 the father of the defendants cut and applied to his use all
the wood of value then remaining.    The land had an exten-
sive ledge of rock running across its centre from north to
south, which was opened by defendants' ancestors as early as
1835.    In 1845 or 1846 large quantities of stone were quarried
and sold by them to railroad companies; and from that time
down to the trial, with longer or shorter intervals, never of
more than a year or two, the ledge was worked more or less
extensively by the defendants or their ancestors in title, or
their lessees and tenants, and the stone removed.    There is no
evidence that any other person had ever worked the ledge or

taken stone off the land, or attempted to do so. The father of the defendants put up a sign on the land, stating that all persons were forbidden from taking wood or stone from it. In 1860 or 1861 his lessee built a barn and tool-shed on the land near the ledge for his use in quarrying, these structures being in full view from Broad Street, formerly the turnpike. He also dug a well, from which he obtained water for his business. The barn, with lofts for hay, was of sufficient capacity "to accommodate, and did accommodate, six or eight horses, or more." It remained on the land, with some additions, until some time in 1869, when it was removed by the lessee. The land was assessed for taxes to the ancestors in title of the defendants, and paid by them, for twenty years, between 1770 and 1805. The tax lists for the other years up to 1805 could not be found. From 1805 to the time of the trial, a period of seventy-seven years, the land was assessed to them, and the taxes were paid by them. The statute of Rhode Island respecting the assessment of taxes, in force between 1798 and 1825, required the assessors to assess taxes on real estate to persons who held and occupied it, and the one in force between 1825 and 1855 required them to assess the taxes to those who held and occupied it or to the owners thereof, and the one in force after 1855, to the owners thereof. No taxes were ever assessed to the Fullers or paid by them. Neither plaintiff nor defendants, nor their ancestors, ever resided on the premises, and the land was occupied and possessed by the ancestors in title of the defendants only in the way mentioned.

Upon the case thus presented, and we have not omitted, we think, any material circumstance in the statement, the defendants asked an instruction to the jury as to the presumption they might make of a lost grant to their ancestor in title, which the court refused. Its charge was thus:

"Of course, gentlemen, if you find that you can presume a grant, if you find from the testimony that there was a lost deed which passed from Abigail Fuller to Jeremiah Richardson, or to Francis Richardson, and the property was inherited by Jeremiah, so that Jeremiah had a good title to convey to Stephen Jencks, that makes the title of the defendants here

complete. . . . But, gentlemen, you are to look into the evidence upon this question of a grant, and if the evidence in favor of the presumption is overcome by the evidence against such a grant, then, of course, you will not presume one. It is a question of testimony."

The defendants requested the court to instruct the jury "that the presumption they were authorized to make of a lost deed was not necessarily restricted to what may fairly be supposed to have occurred, but rather to what may have occurred and seems requisite to quiet title in the possessor."

This instruction the court refused to give, or to modify its charge in conformity with it. The defendants now contend that the court thus erred, its charge being in effect that in order to presume a lost deed the jury must be satisfied that such a deed had in fact actually existed. Such seems to us to be the purport of the charge, and therein there was error.

In such cases "presumptions," as said by Sir William Grant, "do not always proceed on a belief that the thing presumed has actually taken place. Grants are frequently presumed, as Lord Mansfield says, *Eldridge* v. *Knott*, Cowp. 215, merely for the purpose, and from a principle of quieting the possession. There is as much occasion for presuming conveyances of legal estates; as otherwise titles must forever remain imperfect, and in many respects unavailable; when from length of time it has become impossible to discover in whom the legal estate (if outstanding) is actually vested." *Hillary* v. *Waller*, 12 Ves. 239, 252.

The owners of property, especially if it be valuable and available, do not often allow it to remain in the quiet and unquestioned enjoyment of others. Such a course is not in accordance with the ordinary conduct of men. When, therefore, possession and use are long continued, they create a presumption of lawful origin, that is, that they are founded upon such instruments and proceedings as in law would pass the right to the possession and use of the property. It may be, in point of fact, that permission to occupy and use was given orally, or upon a contract of sale, with promise of a future conveyance, which parties have subsequently neglected

to obtain; or the conveyance executed may not have been acknowledged, so as to be recorded, or may have been mislaid or lost. Many circumstances may prevent the execution of a deed of conveyance, to which the occupant of land is entitled, or may lead to its loss after being executed. It is a matter of almost daily experience that reconveyances of property, transferred by the owners upon conditions or trusts, are often delayed after the conditions are performed or the trusts discharged, simply because of the pressure of other engagements, and a conviction that they can be readily obtained at any time.

The death of parties may leave in the hands of executors or heirs papers constituting muniments of title, of the value of which the latter may have no knowledge, and therefore for the preservation and record of which may take no action; and thus the documents may be deposited in places exposed to decay and destruction. Should they be lost, witnesses of their execution, or of contracts for their execution, may not be readily found, or if found, time may have so impaired their recollection of the transactions, that they can only be imperfectly recalled, and of course imperfectly stated. The law, in tenderness to the infirmities of human nature, steps in and by reasonable presumptions, that acts to protect one's rights, which might have been done, and in the ordinary course of things generally would be done, have been done in the particular case under consideration, affords the necessary protection against possible failure to obtain or to preserve the proper muniments of title, and avoids the necessity of relying upon the fallible memory of witnesses, when time may have dimmed their recollection of past transactions; and thus gives peace and quiet to long and uninterrupted possessions.

The rule of presumption, in such cases, as has been well said, is one of policy, as well as of convenience, and necessary for the peace and security of society. "Where one uses an easement whenever he sees fit, without asking leave and without objection," says the Supreme Court of Pennsylvania, "it is adverse and an interrupted adverse enjoyment for twenty-one years is a title which cannot afterward be disputed. Such

enjoyment, without evidence to explain how it began, is presumed to·have been in pursuance of a full and unqualified grant." *Garrett* v. *Jackson*, 20 Penn. St. 331, 335. The same presumption will arise whether the grant relate to corporeal or incorporeal hereditaments. As said by this court in *Ricard* v. *Williams*, 7 Wheat. 59, 119, speaking by Mr. Justice Story : "A grant of land may as well be presumed as a grant of a fishery, or of common, or of a way. Presumptions of this nature are adopted from the general infirmity of human nature, the difficulty of preserving muniments of title, and the public policy of supporting long and uninterrupted possessions. They are founded upon the consideration that the facts are such as could not,·according to the ordinary course of human affairs, occur, unless there was a transmutation of title to, or an ·admission of an existing adverse title in, the party in possession."

It is not necessary, therefore, in the cases mentioned, for the jury, in order to presume a conveyance, to believe that a conveyance was in point of fact executed. It is sufficient if the evidence leads to the conclusion that the conveyance might have been executed and that its existence would be a solution of the difficulties arising from its non-execution. In *Edson* v. *Munsell*, 10 Allen, 557, 568, which was an action for obstructing the enjoyment of an easement, the doctrine of acquiring such rights by prescription or adverse possession is elaborately considered ; and it is there said, that " the fiction of presuming a ·grant from twenty years' possession or use was invented by the English courts in the eighteenth century to avoid the absurdities of their rule of legal memory, and was derived by analogy from the limitation prescribed by the St. of 21 Jac. 1, c. 21, for actions of ejectment. It is not founded on a belief that the grant has actually been made in the particular case, but on the general presumption that a man will naturally enjoy what belongs to him, the difficulty of proof after lapse of time, and the policy of not disturbing long continued possessions."

In *Casey's Lessee* v. *Inloes*, 1 Gill, 430, 503 [*S. C.* 39 Am. Dec. 658], which was an action of ejectment, the Court of Appeals of Maryland held that where there had been a con-

tinuous possession of land for twenty years or upwards by a party or persons claiming under him, the court was authorized to instruct the jury, in the absence of a deed to such party, to presume that one had been executed to him. It also approved. the refusal of the court below to instruct the jury that before they could find a title in the defendants, or any one of them, by presumption of a grant by the plaintiff or those under whom he claims, they must believe on their consciences and find as a fact that such grant was actually made. "The granting of such a prayer," said the court, "would have had a tendency to mislead the jury, by inducing them to believe that the presumption of a grant could not be made, unless the jury, in point of fact, believed in the execution of the grant; whereas it is frequently the duty of the jury to find such presumption, as an inference of law, although in their consciences they may disbelieve the actual execution of any such grant."

In *Williams* v. *Donell*, 2 Head, 695, 697, which was also an action of ejectment, the Supreme Court of Tennessee, speaking on the same point, said : "It is not indispensable, in order to lay a proper foundation for the legal presumption of a grant, to establish the probability of the fact that in reality a grant ever issued. It will be a sufficient ground for the presumption to show that, by legal possibility, a grant might have issued. And this appearing, it may be assumed in the absence of circumstances repelling such conclusion that all that might lawfully have been done to perfect the legal title was in fact done, and in the form prescribed by law."

In accordance with the doctrine thus explicitly declared, there can be no doubt that the court below should have instructed the jury as requested. It would seem from the instruction given that the deed which the defendants insisted might be presumed was one from Ezekiel and Abigail Fuller, or from Abigail Fuller to Jeremiah Richardson. We think, however, that the facts point with equal directness to a conveyance from his grandfather. The codicil to his will, by which he devised the property to his married daughter, was dated several years before his death, and there was no evidence that he was seized of it at that time, except the presumption

arising from his having once possessed it.   It does not appear
that either the devisee or her husband ever exercised any acts
of ownership in any way, or ever claimed to own it.   After
he left Smithfield, two of his children were supported by the
the town, and the agent of the town, appointed to search for
any property belonging to the father, from the sale of which
the children might be supported, reported that there was only
the six-acre parcel, which was held by him in the right of his
wife.   He afterwards went to the poor-house, where he died
in 1800.   During the thirty-nine years after he left Smithfield,
and notwithstanding his having been part of that time in the
poor-house, no word appears to have come from him asserting
that he had any interest in the property.   It is difficult to rec-
oncile his conduct or that of his wife, the devisee, if in truth
the testator continued the owner of the property until his
death, and it passed under the codicil to his will.   While Eze-
kiel Fuller was still living, and for several years after he had
left Smithfield, Jeremiah Richardson, the testator's grandson,
asserted ownership of the tract by its sale to Stephen Jencks
by a deed with covenants of title and warranty, which was re-
corded in the town records.   No word of opposition to this
sale or to the subsequent mortgage of the property by the
grantee was ever made, so far as the record discloses.   The
fact that Jeremiah Richardson was a minor when his grand-
father died does not militate against the presumption of a
deed to him.   Nothing would be more natural than a deed of
gift from the grandfather to the grandson.   It would also
seem from the charge of the court, that in the deed of Jere-
miah to Jencks he recited that the property had come from
his honored grandfather, or words to that effect.

If, however, the evidence which, as the record says, tended
to show that the devisee and her husband entered into the
possession of the property devised, and the recital in his deed
of April 11, 1761, of the 20-acre parcel, that it was bounded
on the north by his *former* land, can be considered as rebut-
ting the presumption of such a deed by the testator, then the
defendants may fall back on the presumption of a deed to
Jeremiah Richardson by Ezekiel and Abigail Fuller, the de-

visee, and her husband. There is nothing in the conduct or language of either of these parties which in any way repels such a presumption. Their silence and non-claim of the property would rather indicate that they had parted with their interest. The minority of Jeremiah at the time only shows his inability to purchase the property, but those, under whose charge he was, could have purchased it for him, and had the deed executed to him. His orphanage may have induced such a proceeding. We do not, therefore, think that his minority at the time can be urged against the presumption of a deed to him.

For the refusal of the court below to give the instruction requested, the case must go back for a new trial. We will add, moreover, that though a presumption of a deed is one that may be rebutted by proof of facts inconsistent with its supposed existence, yet where no such facts are shown, and the things done, and the things omitted, with regard to the property in controversy, by the respective parties, for long periods of time after the execution of the supposed conveyance, can be explained satisfactorily only upon the hypothesis of its existence, then the jury may be instructed that it is their duty to presume such a conveyance, and thus quiet the possession.

How long a period must elapse after the date of the supposed conveyance before it may be presumed to have existed has not always been a matter of easy determination. "In general," said this court, speaking by Mr. Justice Story, "it is the policy of courts of law to limit the presumption of grants to periods analogous to those of the statute of limitations in cases where the statute does not apply. But where the statute applies, it constitutes, ordinarily, a sufficient title or defence, independently of any presumption of a grant, and, therefore, it is not generally resorted to. But if the circumstances of the case justify it, a presumption of a grant may as well be made in the one case as in the other; and where the other circumstances are very cogent and full, there is no absolute bar against the presumption of a grant, within a period short of the statute of limitations." *Ricard* v. *Williams*, 7 Wheat. 59, 110.

The general statement of the doctrine, as we have seen from the authorities cited, is that the presumption of a grant is indulged merely to quiet a long possession which might otherwise be disturbed by reason of the inability of the possessor to produce the muniments of title, which were actually given at the time of the acquisition of the property by him or those under whom he claims, but have been lost, or which he or they were entitled to have at that time, but had neglected to obtain, and of which the witnesses have passed away, or their recollection of the transaction has become dimmed and imperfect. And hence, as a general rule, it is only where the possession has been actual, open and exclusive for the period prescribed by the statute of limitations to bar an action for the recovery of land, that the presumption of a deed can be invoked. But the reason for attaching such weight to a possession of this character is the notoriety it gives to the claim of the occupant; and, in countries where land is generally occupied or cultivated, it is the most effective mode of asserting ownership. But, as Mr. Justice Story observes, in delivering the opinion of this court in *Green* v. *Liter*, 8 Cranch, 249, "In the simplicity of ancient times there were no means of ascertaining titles but by the visible seizin; and, indeed, there was no other mode, between subjects, of passing title, but livery of the land itself by the symbolical delivery of turf and twig. The moment that a tenant was thus seized he had a perfect investiture; and, if ousted, could maintain his action for the realty, although he had not been long enough in possession even to touch the esplees. The very object of the rule, therefore, was notoriety; to prevent frauds upon the lord and upon the other tenants." There may be acts equally notorious, and therefore equally evincive of ownership, which, taken in connection with a long possession, even if that possession has been subject to occasional intrusion, are as fully suggestive of rightful origin as an uninterrupted possession. Where any proprietary right is exercised for a long period, which, if not founded upon a lawful origin, would in the usual course of things be resisted by parties interested, and no such resistance is made, a presumption may be indulged that the proprietary right had

lawful origin. The principle is thus stated by Mr. Justice Stephen of the High Court of Justice of England, in his Digest of the Law of Evidence, using the term grant in a general sense, as indicating a conveyance of real property, whether corporeal or incorporeal: "When it has been shown that any person has, for a long period of time, exercised any proprietary right which might have had a lawful origin by grant or license from the Crown or from a private person, and the exercise of which might and naturally would have been prevented by the persons interested; if it had not had a lawful origin, there is a presumption that such right had a lawful origin and that it was created by a proper instrument which has been lost." Art. 100.

This presumption may, therefore, in some instances, be properly invoked where a proprietary right has long been exercised, although the exclusive possession of the whole property, to which the right is asserted, may have been occasionally interrupted during the period necessary to create a title by adverse possession, if in addition to the actual possession there were other open acts of ownership. If the interruptions did not impair the uses to which the possessor subjected the property, and for which it was chiefly valuable, they should not necessarily be held to defeat the presumption of the rightful origin of his claim to which the facts would otherwise lead. It is a matter which, under proper instructions, may be left to the jury.

In the present case, acts of ownership over the property in controversy by the ancestors in title of the defendants, so far as they could be manifested by written transfers of it, either as conveyances of title or by way of security, were exercised from 1768 for more than a century. The first conveyance, from which the defendants trace their title, was duly recorded in the land records of the town soon after its execution in that year. The assessment of taxes on the property to those ancestors, and their payment of the taxes for twenty years between 1770 and 1805, and the assessment of taxes to them or to the defendants for seventy-seven years after 1805, and the payment of the taxes by them, such assessment being required to be made, under the laws of the state, to occupants or owners

of the land, are circumstances of great significance, taken in connection with their constantly asserted ownership. In *Ewing* v. *Burnet,* this court speaks of the uninterrupted payment of taxes on a lot for twenty-four consecutive years as "powerful evidence of claim of right to the whole lot." 11 Peters, 41, 54. Here, as seen, the taxes were uninterruptedly paid by the defendants or their ancestors in title for a much longer period.

In *St. Louis Public Schools* v. *Risley's Heirs,* the Supreme Court of Missouri said: "Payment of taxes has been admitted in questions of adverse possession, and may have an important bearing, as it is not usual for one owning realty to neglect paying taxes for a period which would be sufficient to constitute a bar under the statute of limitations, or for one to pay taxes having no claim or color of title." 40 Missouri, 356, 370. In *Davis* v. *Easley,* which was an action of ejectment, the Supreme Court of Illinois held that receipts for taxes paid by the plaintiff were admissible, and said: "The payment of taxes indicated that the plaintiff claimed title to the whole tract. It likewise tended to explain the character and extent of his possession." 13 Ill. 192, 201.

In this case, the ancestors of the defendants entered upon the land under claim of title, and opened and worked the ledge of rock running through it as early as 1835, and from 1846 they or their tenants or lessees continued, with occasional intervals, to work that ledge to the time of trial in 1882, a period of thirty-six years, and it does not appear that during that time any one ever interfered with their work or complained of it. To constitute an adverse possession it was not necessary that they should have actually occupied or enclosed the land. It was sufficient that they subjected it to such uses as it was susceptible of to the exclusion of others. *Ellicott* v. *Pearl,* 10 Pet. 412, 442. That subjection might be shown by the quarrying of the ledge and the removal of the stone, without disturbance or complaint from any quarter. The exclusive working of the quarry, under claim of title to the whole tract by virtue of conveyances in which it was described, might operate in law to carry the possession over the whole; and the payment of taxes thereon might authorize the jury to infer

a continuous possession of the whole, notwithstanding any temporary and occasional intrusion by others upon a different part of the tract, which did not interfere with the work.

The entry of the plaintiff with the attorney of his co-heirs in 1874, and the delivery of the deed to him with a handful of earth, if weight and consideration are to be given to that proceeding under the circumstances in which it was made, would only reduce the period of undisturbed possession to twenty-eight years. The cutting of wood on a different portion of the land by the Fullers for family use, or the manufacture of baskets, at occasional intervals during a portion of this period, though competent for the consideration of the jury, was not necessarily an interruption to the peaceable occupation of the land, so far as quarrying of the ledge and the removal of the stone were concerned, to which uses the defendants and their ancestors in title subjected it, and which appear to have constituted its principal value. Nor did it necessarily change the legal effect of the possession for quarrying the ledge with the attendant claim to the whole tract.

In *Webb* v. *Richardson*, the Supreme Court of Vermont, in speaking of interruptions in the actual occupancy of real property as affecting the claim of continuous possession, said: "To constitute a continuous possession it is not necessary that the occupant should be actually upon the premises continually. The mere fact that time intervenes between successive acts of occupancy does not necessarily destroy the continuity of the possession. The kind and frequency of the acts of occupancy necessary to constitute a continuous possession depend somewhat on the condition of the property, and the uses to which it is adapted in reference to the circumstances and situation of the possessor, and partly on his intention. If, in the intermediate time between the different acts of occupancy, there is no existing intention to continue the possession, or to return to the enjoyment of the premises, the possession, if it has not ripened into a title, terminates, and cannot afterwards be connected with a subsequent occupation so as to be made available toward gaining title; while such continual intention might, and generally would, preserve the possession unbro-

ken." 42 Vt. 465, 473. That was an action of trespass for cutting timber on the land of the plaintiff, who was in possession at the time, and offered testimony to prove that his possession was earlier than the defendant's, and also that he had acquired the land by fifteen years' adverse possession. The defendant did not show a chain of title back to the original proprietor of the land, but showed that his grantors entered into possession in 1835, and cut timber and claimed to own the land, and it was held that the question whether this entry interrupted the plaintiff's possession should have been submitted to the jury under proper instructions, in connection with the plaintiff's evidence of continuous possession under those through whom he claimed, and that it was error to refuse to submit it.

Our conclusion is, that the claim to the land in controversy by the defendants and their ancestors in title for over a century, with the payment of taxes thereon, and acts of ownership suited to the condition of the property, and its actual use for thirty-six or twenty-eight years, it matters not which, would justify a presumption of a deed to the original ancestor, Jeremiah Richardson, to quiet the possession of the defendants claiming under him, and the jury should have been permitted to presume such a deed without finding from the testimony that there was in point of fact a deed which was lost. If the execution of a deed was established, nothing further would be required than proof of its contents; there would be no occasion for the exercise of any presumption on the subject. It is only where there is uncertainty on this point that the presumption is indulged to quiet the possession.

*The judgment of the court below must be reversed, and the cause remanded for a new trial.*