## FOWLER et al. v. TEXAS EXPLORATION CO. et al. (No. 8773.) *

(Court of Civil Appeals of Texas. Galveston. Nov. 19, 1926. Rehearing Denied Jan. 20, 1927.)

1. **Appeal and error ⟲1010(1)—Trial court's finding, sustained by evidence, against presumption of validity of second marriage while former spouse is living, must be upheld.**

Presumption of validity of second marriage at time former spouse of one of parties is living being one of fact, trial court's finding against such presumption must be upheld if there is sufficient evidence to sustain it.

2. **Marriage ⟲50(1)—Evidence held to show that ancestor through whom claim of title was made as inheriting from wife was not divorced from first wife.**

Evidence held sufficient to sustain trial court's finding that person through whom claim was made as inheriting from his wife was not divorced from first wife at time of marriage.

3. **Public lands ⟲172(7)—Evidence held to sustain finding original unenforceable contract for sale of land was subsequently ratified.**

Evidence held to sustain finding that original contract for sale of land, although unenforceable because of inhibition of colonization laws at time it was made, was subsequently ratified by grantor and by his widow and children after such inhibition against alienation of lands by colonists had been removed by decree of March 26, 1834, authorizing settlers to sell land at any time.

4. **Deeds ⟲207—Finding that title had passed from ancestor is authorized, where title has been openly and notoriously asserted for long period against heirs.**

Where title has been openly and notoriously asserted as against heirs of one who held title in his lifetime and who must have known of adverse claim and assertion of title, court or jury is authorized to find that such title had passed by deed or otherwise from ancestor, and evidence need not conclusively establish that grant was made, but need only lead to conclusion that conveyance might have been executed.

**5. Estoppel ⬳25—Strangers cannot take advantage of any estoppel arising as between parties to deed.**

Strangers to deed cannot take advantage of any estoppel that might have arisen as between parties thereto.

Appeal from District Court, Brazoria County; Norman G. Kittrell, Special Judge.

Trespass to try title by Hugh Fowler and others against the Texas Exploration Company and others. Judgment for defendants, and plaintiffs appeal. Affirmed.

W. T Williams, of Austin, and Charles S. Pipkin, A. D. Moore, and Oliver J. Todd, all of Beaumont, for appellants.

Ross & Wood and Campbell, Myer & Simmons, all of Houston, Lewis H. Follett, of Angleton, John E. Green, Jr., of Houston, David Proctor, of Fort Worth, and Kennerly, Williams, Lee & Hill, of Houston, for appellees.

Peareson & Peareson, of Richmond, for appellees George Hamman and others.

PLEASANTS, C. J. This is an action of trespass to try title and for damages, brought by the appellants against this appellees. The land involved in this suit is 2,214 acres described as the northwest one-half of the A. Darst league in Brazoria county. The defendants pleaded not guilty and statutes of limitation of three, five, ten, and twenty-five years. The necessity for any further statement of the pleadings is obviated by an agreement of the parties to the effect that the pleadings should be regarded as sufficient to support any cause of action or defense which might be shown by the evidence, and that none of the parties should be confined to or limited by the special pleading contained in the petition, or answers of the defendants. The trial in the court below without a jury resulted in a judgment in favor of the defendants.

It is further agreed in substance by appellants and appellees that, for the purpose of this appeal, appellees have acquired and hold all of the title which was acquired in the northwest one-half of the A. Darst league by Henry Austin or any one claiming under him, save such interest as may have been acquired by appellants pendente lite and which is not involved in this suit, and that the only title or claim asserted by the original and intervening plaintiffs, save and except the interest claimed to have been acquired pendente lite, is through and under Alpheus P. Rice, Sr.

The league of which the land in controversy is a part was granted to A. Darst, a citizen of Austin's Colony, on May 6, 1831. Abraham Darst, the grantee of this league, was twice married. His first wife died some years before he immigrated to Texas in 1829 with his second wife, Jemina, and a large family of children. At his death, which occurred in the latter part of 1834 or the first part of 1835, he left surviving children by each of his wives.

Rosetta Darst, one of the children of Abraham and Jemima Darst, became the wife of Alpheus P. Rice in 1847. The exact date of their marriage is not shown, but in proceedings had in the probate court in the estate of her brother Patrick Darst, in May, 1847, she is referred to as Rosetta Darst, and in August, 1847, she is joined in the execution of a deed by Alpheus P. Rice as her husband. From these circumstances it may be fairly inferred that her marriage to Rice was consummated at some time between these dates. They continued to live together as husband and wife until her death in 1852. Two children were born to them, both of whom died in infancy, before the death of their mother. The trial court finds upon sufficient evidence that Rosetta died several years prior to the death of her husband, Alpheus P. Rice. He left surviving him several children by a former wife. Plaintiffs are the descendants and assignees of descendants of these children, and as such have title to such proportionate interest as their predecessors in title held in any interest in the land in controversy Alpheus P. Rice might have acquired by inheritance from his wife Rosetta.

On November 21, 1831, Abraham Darst signed an instrument before the proper authority by which he agreed, in consideration of the payment by Henry Austin of the government fees necessary to perfect his title to his headright league, to convey to Austin, as soon as the laws of the state would permit, the northwest half of the league. This instrument, which is duly recorded, contains the following recitals:

"That having received for the senor commissioner title of possession for one sition of land in this colony as is proved by the certified copy which he manifested of date—of the prox. passed May, and he being in a state that he cannot pay the corresponding fees, he has covenanted with the citizen Henry Austin of the same precinct as follows:

"That in consideration of the said Austin having paid all the corresponding fees with exception of the recognition fee that is to be paid to the government according to law and in the terms therein expressed and having the said Austin agreed to pay the said recognition fee, the grantor by this document obligates himself, etc., to execute in favor of said Henry Austin a writing of sale or transfer for the north west half of the said sitio so soon as the laws of this state will permit him to transfer in sale of his lands."

Abraham Darst died at his home on the southeast half of the league in the latter part of 1834 or early in 1835, the exact date of his death not being shown. On February 9,

1835, his son-in-law, Samuel Damon, who also resided on the southeast half of the league, applied for letters of administration on the estate and for "power and authority to collect the dues, marshal the assets, and liquidate all demands of and against said property". This application was granted, and on March 25, 1835, the administrator applied for an order for the sale of the personal property of the estate, reciting in the application that the property was "of a perishable nature and liable to decay and deterioration by delay." We think it a reasonable inference from these recitals that the application for administration was made very shortly after the death of Darst, and the finding of the trial court that he died late in 1834 or early in 1835 is sustained by the evidence.

On June 15, 1835, the report of the partition of land of the estate, consisting of the southeast half of the A. Darst league, among the heirs, was approved. The parties who shared in this partition were the widow, Jemima Darst, and the named children, Edmund, Abraham, John, Emery, Lorena, wife of Samuel Damon, Rosetta, Richard, and Patrick. In this partition 500 acres out of the southwest half of the league was reserved to be sold or disposed of for the purpose of paying the debts of the estate. All of the land partitioned was southeast of a line dividing the league into two equal parts and running parallel with its southeast line. As shown by the commission under which this partition was made, Henry Austin was one of the commissioners of partition.

On November 4, 1836, Austin paid the final fees due the Mexican government on the Darst league, amounting to $30, and filed a receipt therefor in the court administering the Darst estate.

The following quotations from the elaborate findings of fact by the learned trial judge are sustained by the evidence and adopted as our conclusion of fact:

"Upon December 27, 1837, Samuel Damon, as administrator of said estate, executed a formal conveyance to said Henry Austin for the said northwest half of said survey, reciting a consideration 'of two hundred dollars paid for the benefit of said Darst in his lifetime.' Said deed further recites that the said northwest half of said survey was sold by said Abraham Darst to said Austin and a title bond for the conveyance thereof executed on June 21, 1831, and that the said title bond with the petition of said Austin having been presented to the chief justice in probate court, praying a compliance with the conditions of said bond by the succession of said Darst, and that the honorable, the judge of probate, having with assistant justices ordered and authorized the said Damon as administrator of said estate to execute a title bond for said half league of land in conformity to said bond, that he, said Damon, executed said title deed in the name, stead, and place of said Darst, as administrator of his succession under order of court. In this deed Henry Austin is recited to be 'of Bolivar.' Said deed was acknowledged by said Damon as such administrator before William P. Scott, chief justice ex officio notary public, upon December 27, 1837, and filed for record in the office of the clerk of the county court of Brazoria county upon December 27, 1837.

"Neither the said application recited in said deed to have been filed by said Austin, nor the said order recited to have been made by said court, are on file or of record, and there is no evidence before the court other than said recital as to the contents of said application, or of said order, or as to the showing made to said court as a basis for said order.

"Upon April 20, 1837, Samuel Damon, by his attorney, P. C. Jack, filed his final report as such administrator, in which report he sets out that he had settled up all the business of said estate, and that all of the property of said estate had been divided up among the heirs thereof, and that he had been appointed guardian of all the heirs, and praying that his duties as administrator close and that he be discharged therefrom.

"None of the papers filed in the estate of Abraham Darst or orders entered in said estate are of record, other than a certified copy of said order of partition made in June, 1835, and recorded in Volume A, page 83, et seq., and in the deed records of Brazoria county, and a number of the papers filed and orders made in said estate have been lost, and there is no evidence as to the substance or contents of such missing papers or orders."

The Darst league is located on or near the boundary line between Fort Bend and Brazoria counties. Between the years 1837 and 1847 the boundary line between these counties seems not to have been definitely established. Henry Austin rendered 2,214 acres of the survey for taxes in 1837 in Brazoria county, and in 1847 made his rendition of same land in Fort Bend county. Since the date last named the survey has been known to be in Brazoria county and has been rendered for taxes in that county.

On August 1, 1848, Austin conveyed the northwest half of the survey to D. Atchison of Galveston. In describing the land thereby conveyed, this deed contains the following recitals:

"All that certain piece, parcel or tract of land, situated in the county of Fort Bend, to the east of the River Bernard, being the northwest equal half of a league of land granted to Abraham Darst by the commissioner of government in the month of May, A. D. 1831, as by title deed of record in the archives of Austin colony now in the general land office of the state of Texas, will fully appear, which half league of land appertains to me in right of possession and property by virtue of a title deed executed in my favor on the twenty-seventh day of December, A. D. 1837, of record in the county of Brazoria county, in which the land was then situated, Record Book C, page 130, the metes and bounds of said league of land, the northwest equal half part of which is hereby conveyed, are as follows," etc.

Atchison conveyed the land to A. C. Holt on January 26, 1855, by the following description:

"Being the northwest equal half part of a league of land granted to Abraham Darst by the commissioner of the government in the month of May, A. D. 1831, eighteen hundred and thirty-one, as by title deed of record in the archives of Austin's colonies now in the general land office of the state of Texas will fully appear, and which was conveyed to Henry Austin by deed dated twenty-seventh day of December, A. D. 1837. And conveyed to me by said Austin as fully appears from his deed of record in Book E, pages 17 and 18 in the county of Brazoria."

The evidence shows that the 2,214 acres of land, the northwest one-half of the A. Darst league, have been rendered for taxes and the taxes paid thereon by Henry Austin, and those claiming under him, since 1837. This claim and active assertion of ownership and dominion over the land by Austin and his vendees has continued since 1837. No claim to the land or any interest therein was ever asserted by any of the children of Abraham Darst, or by the children of Alpheus P. Rice, who knew of his marriage to Rosetta Darst and must be charged with notice of the claim of Austin and those holding under him.

The evidence further shows that Alpheus P. Rice received a grant of land as the head of a family in 1838. At that time he was living in Washington county and operated a blacksmith shop. He was then living with his first wife, whose name was Susan Parrah. The records of Washington county show that he and his wife Susan, in January, 1846, made a conveyance of some of his land in that county. One of her descendants testified in this case that it was family history that he deserted his first wife. Another of plaintiff's witnesses testified that it was family history that he was divorced from his first wife. The only direct definite evidence as to the dates when his relations with his first wife terminated and those with Rosetta Darst began is the deed executed by him and his wife Susan in January, 1846, and the deed executed by him and his wife Rosetta in August, 1847. After his marriage to Rosetta he lived in Brazoria and Wharton counties until Rosetta's death in 1852, which occurred at their home in Wharton county, just across the line of Brazoria county, and near the Darst league.

The first wife, Susan, died in Waller county in 1864. She never remarried.

The court records of Washington, Brazoria, Wharton, Fort Bend, Waller, Harris, Walker, Matagorda and Austin counties, extending back to a time prior to the time he was living with his wife Susan, have all been preserved and are in perfect condition, and none of these records show that Rice obtained a divorce from his first wife. While living in Brazoria county with Rosetta, he joined her in several conveyances made at different times by which they disposed of all the lands received by her in the partition of the estate of her father and mother, and also the estates of one or two of her brothers. After disposing of all the land inherited by her, they purchased a home near the Darst league, but in the adjoining county of Wharton. They were living at this home, which was subsequently known as the Boone place, at the time of Rosetta's death. Shortly after her death her brother or brothers took possession of this place, which was subsequently sold by her brother Richard Darst to Boone, and the title so acquired by Boone has remained unquestioned by Alpheus P. Rice or any of his descendants. As before stated, there is sufficient evidence to sustain the trial court's finding that Alpheus P. Rice survived Rosetta for several years and died in Fort Bend county, but the evidence is silent as to how long he remained in Wharton county after her death.

From this evidence the trial court found that Alpheus P. Rice was never divorced from his first wife, and his marriage with Rosetta Darst being unlawful, he inherited no part of her estate. The court further concluded, upon the evidence before set out, that Abraham Darst, after the repeal in March, 1834, of the law inhibiting the contract of sale executed by Darst and Henry Austin, ratified and confirmed the contract and made a parol sale of the land to Austin for an additional consideration, and that after the death of Darst the court administering his estate, the administrator, and the widow and adult children, with full knowledge of the facts, ratified and confirmed the contract and permitted and caused Austin to make the final payment of the fees due the government on the land, for the benefit of the estate and the widow and children. The court further found:

"I presume and do here now presume a deed from said Jemima Darst and also a deed from said Alpheus Rice and Rosetta Rice conveying to some one or more of defendants' predecessors in title, any and all right, title, interest, or claim which said Jemima Darst and said Rosetta Rice and Alpheus Rice, Sr., or any of them, had in or to said northwest half of said Darst survey. I do not think the facts or circumstances of this case can be reconciled upon any other basis than that at the time of the death of said Rosetta Rice she had no right, title, interest, or claim of any kind in or to said northwest half of said survey. She died without claiming any interest, although she had spent the major portion of her life upon the southeast half of said survey, and had conveyed away all her interest therein."

It is obvious that if these conclusions are sustained by the evidence, the judgment in favor of appellees should be affirmed; no

error in the conduct of the trial being presented as ground for reversal. We cannot agree with appellants that the trial court was compelled, upon the facts of this case, to presume the legality of the marriage of Alpheus Rice and Rosetta Darst. The rule which authorizes a court to presume that a second marriage is lawful, notwithstanding the evidence in the case shows that at the time of the second marriage a former spouse of one of the parties to the second marriage was living, is just and salutary, and is founded upon the presumption of innocence which should always be indulged in passing judgment upon the acts of our fellowman, especially when such presumption is necessary to protect the legitimacy of children. Smith v. Smith, 1 Tex. 632, 46 Am. Dec. 121; 18 R. C. L. 416, 417.

The rule in cases of this kind is thus correctly stated in 38 Corpus Juris, pp. 1329, 1330:

"In the case of conflicting marriages of the same spouse, the presumption of validity operates in favor of the second marriage. Accordingly the burden of showing the validity of the first marriage is on the party asserting it, and even where this is established it may be presumed in favor of the second marriage that at the time thereof the first marriage had been dissolved either by a decree of divorce or by the death of the former spouse, so as to cast the burden of adducing evidence to the contrary on the party attacking the second marriage."

[1] It is apparent from this statement of the rule, the presumption in favor of the validity of a second marriage being one of fact, that the finding of a trial court against such presumption must be upheld if there is sufficient evidence to sustain it.

[2] The evidence in this case goes much further than merely showing that a former wife of Alpheus Rice was living at the time he married Rosetta Darst. He deserted his first wife and left his former home in Washington county at some time between January, 1846, and August, 1847, as the record evidence shows that he was living with her in January, 1846, and that he contracted his marriage relations with Rosetta Darst at some time between May and August, 1847. From that time until the death of Rosetta he lived with her in Brazoria and Wharton counties. After his desertion of his former wife and children they removed from Washington county and are shown to have resided in Waller county, where she died some years after his death. The court records of Washington, Waller, Brazoria, and Wharton counties and all of the counties immediately adjoining these counties, extending back to a period prior to the time Rice deserted his first wife, have all been properly kept and preserved, and all fail to show any decree of divorce or annulment of the marriage between him and his wife Susan Parrah. After the death of Rosetta he left Wharton county without making any claim to her property, which it is shown was appropriated by her brothers. No claim to any interest in his wife's estate is shown to have been asserted by him, his children, or their descendants, until a short time before this suit was brought, other than statements now made by some of these descendants that some of their ancestors claimed or thought they had some interest in the Darst estate.

We think these facts are sufficient to sustain the finding of the trial court that Alpheus Rice was never divorced from his first wife.

After the lapse of time it would ordinarily be impossible to prove by positive direct evidence the negative fact that no divorce was obtained from his first wife. But such character of evidence is not required. We think it a reasonable inference from all the circumstances above recited that no divorce was obtained, and the trial court having made this inference from the evidence, such finding should not be set aside by this court.

The other findings of the trial court before set out present questions more difficult of decision.

As held by the learned trial judge, the contract between Darst and Austin for the sale of the land was unenforceable when made, because inhibited by the colonization laws of the state of Coahuila and Texas, under which the grant was obtained. This inhibition against the alienation of land by a colonist was removed by the decree of March 26, 1834, which authorized all settlers who had received title to their lands to sell them at any time. Clay v. Clay, 26 Tex. 24. The grant to Darst having been made and the title issued in 1831, he could make a valid contract of sale, or sale, of the land after March 26, 1834, and under the law then in force a verbal sale of land was valid. The trial court also recognized the well-settled law of decision in this state, that probate courts under the laws of this state in 1837 were not authorized to decree specific performance of a contract for the sale of land; such power not having been conferred upon county courts until the Act of February 2, 1844. Houston v. Killough, 80 Tex. 296, 16 S. W. 56. The order of the court directing the administrator to make conveyance of the land to Austin is not found in the record, and the recitals in the deed made by the administrator to Austin, which was executed in December, 1837, do not give the date of the order of the court directing the execution of the deed. The trial court seems to have assumed that the order was made at a time when the court was not authorized to decree specific performance of the contract, and the case is presented here on that assumption. Upon this state of the record the holding of the court that Austin and those who held under him acquired title to the land can only

be sustained on the ground that all or some of the conclusions of the court before set out as to the ratification of the contract and verbal sale by Darst and its ratification by his widow and children, and the presumption of a deed from Alpheus and Rosetta Rice and Jemima Darst, are supported by the evidence.

[3] We cannot hold with appellants' contention that the evidence did not authorize these findings by the trial court. The acquiescence by all of the Darst family, and by Alpheus Rice and his descendants, in the claim and active assertion of ownership and the possession of the land by Austin and those holding under him, are so consistent with the findings that the original contract was ratified by Abraham Darst in his lifetime and by his widow and children, and that Alpheus Rice and wife, Rosetta, and Jemima Darst, either by deed or otherwise, released Rosetta's apparent title, as to authorize the court to make these findings.

[4] The salutary rule which authorizes a court or jury to find when a title has been openly and notoriously asserted for a long period of time, as against the heirs of one who held the title in his lifetime and must have known of the adverse claim and assertion of title, and such continuous adverse claim and active assertion of ownership is known and long acquiesced in by the heirs, that such title had passed by deed or otherwise from their ancestor, is a settled rule of decision in this state. The rule is generally referred to as the presumption of a deed or grant, but it seems to us it could be more accurately termed proof of title by circumstantial evidence. The rule has been given the most liberal interpretation and application by our courts. The following quotation from the case of Frugia v. Trueheart, 48 Tex. Civ. App. 513, 106 S. W. 742, shows the extent of its application:

"The law further is that where the fact or deed, as the case may be, which is sought to be presumed, lies back thirty or more years, and the parties claiming the presumption, or those whose estate they have, or both combined, have during such period openly and notoriously, and with the acquiescence of their adversaries, claimed and exercised acts of ownership over the land in question, such as might reasonably be expected from owners thereof, and the circumstances in evidence, taken in their entirety, are consistent with the presumption sought to be indulged, and it is more reasonably probable that the facts sought to be presumed existed than that they did not, then the jury are at liberty to presume them and find accordingly."

It is not necessary to such finding that the evidence satisfies the mind of the court or jury that the grant was made. It is sufficient if the evidence leads to the conclusion that a conveyance might have been executed and that its existence would explain and account for the long claim and assertion of ownership on the one side and the acquiescence on the other. Fletcher v. Fuller, 120 U. S. 534, 7 S. Ct. 667, 30 L. Ed. 759. The holding in the Fletcher Case has been often quoted and aproved by the courts of this state. Brewer v. Cochran, 45 Tex. Civ. App. 179, 99 S. W. 1033.

The fact that Austin obtained a deed from the administrator, which recites that it was made in pursuance of an order of the court administering the estate in fulfillment of the obligations of the contract executed by Darst, is not conclusive against the finding of the trial court of a verbal sale by Darst, nor the ratification of the contract by Darst and his widow and children, or of a conveyance by Alpheus Rice and his wife Rosetta. This was the holding in the cases of Mooris v. Moore (Tex. Civ. App.) 216 S. W. 891, and Southwestern Development Co. v. Village Mills Co. (Tex. Civ. App.) 230 S. W. 869.

[5] Appellants' contention that appellees are estopped by the recitals in the administrator's deed from claiming any other title than that obtained under the original contract of sale between Darst and Austin is without merit. Appellants are not privies to this deed either in blood or estate. Being strangers to the deed and not bound by its recitals, they cannot take advantage of any estoppel that might have arisen as between the parties thereto. 21 Corpus Juris, p. 1067: Thompson on Real Property, vol. 3, pp. 601 and 602.

It follows from the conclusions before expressed that the judgment of the trial court should be affirmed, and it has been so ordered.

Affirmed.