Truax, J.
Many of the questions that arise in this case were determined by the general term of this court in the case of Abendroth v. The Manhattan Railway, etc. (7 N. Y. State Rep., 43).
For instance, it was there determined that assessments, imposed on real property in the city of New York for local improvements of streets are special contributions paid by an abutting owner in addition of and exclusive of the general tax which he pays as one to the general public,' and that by paying such an assessment a contract must be implied that will secure to the abutting owner his right to use and enjoy the street, with all the improvements and advantages, to the creation of which he has especially contributed.
I have found, as matter of fact in this case, that the owners of the property mentioned in the complaint have paid assessments for the improvement of the street.
*861 Under the decision in the Abendroth Case such payment-gave the plaintiffs an easement in the street.
It was also held in the. Abendroth Case, that a person’s right to enjoy property free from smoke, gas, steam and cinders, is property, and that when he is deprived of that right without due process of law, he is deprived of his private property without compensation and in violation of the constitution of the state.
The principal question discussed in the Abendroth Case was, whether a different rule should be applied to those eases in which the property was situate on a street that had been opened under a Dutch government, from that applied to those cases in which the property was situated on streets that were opened under the English, colonial or state governments, and it was there determined that, conceding that the fee of the street which had been opened under the Dutch government was in the city, and that the city had divested itself of this fee for the benefit of the railroad companies, still the defendants had no right to use their own property in the manner it was shown on that trial, that-■they had used their property to the injury of the property of another.
I have been asked by both of the parties to this action to find that the fee in the street in front of the premises mentioned in the complaint, passed to and was vested in one Ann Litscho and one Balthazar de Haart, as early as the year 1668.
Now, the presumption is that it remains in the heirs of Litscho and de Haart, unless it has been alienated, devised or conveyed by them, or that in default of heirs it has es-cheated to the state.
The law infers that the owners of lands lying on a highway are the owners of the fee of a highway; that the rights of the public therein and thereto are no higher or' other than those of a mere easement, and that the proprietors on each side own the soil in fee to the center of the highway. Wager v. Troy Union R. R., 25 N. Y., 529.
This presumption applies as well to the streets of a city as to a country highway. Bissell v. N. Y. Central R. R., 23 N. Y., 61.
This presumption of law is founded on the supposition that the way was originally granted by the adjoining proprietors in equal proportions, and may be rebutted by proof to the contrary. Watrous v. Southworth, 5 Conn., 305.
It is rebutted by the production of - a deed under which the owner derives title, granting the land to the side of the street only. Smith v. Slocomb, 11 Gray, 280.
The discontinuance of the highway, conveys nothing back to the adjacent owner. It simply authorizes him to *862 resume the occupation of his land, which had been suspended, discharged from the servitude to which it had been subjected. Peck v. Smith, 1 Conn., 126.
_ The fee thus being in the original owner, it descends to his heirs _ if not alienated, devised or conveyed by him, or escheats, in failure of his heirs, to the state. See same case.
The defendant says that there is no proof that Litscho or de Haart have ever alienated, devised or conveyed this fee.
Many deeds were offered in evidence which would have conveyed the fee in the streets, provided the grantors had owned the fee in the streets.
Where land is found in the possesion of a certain person, and then after a lapse of many years is found to be in the possession of his decendant, a presumption arises that such descendant has taken by deed or has inherited, not only the particular piece of property that is in his possession, but also all the easements pertaining to that property. Fletcher v. Fuller, 120 U. S., 534:
But this case may be decided in favor of the plaintiffs whether we hold that the fee of Pearl street, in front of their premises is in the heirs of de Haart or whether the fee is in the owners of the adjoining property, or in the city.
It was shown on the trial, that Pearl street in front of the plaintiff’s premises, was in use as a public street or road prior to the conquest of the New Netherlands by the English, and therefore, whatever right the Dutch government had in and to the street, became vested in the British Crown.
Now, if it -be taken as the fact that prior to the conquest, the fee of the road was in the Dutch government, then by the conquest, that fee went to the British Crown. The fee remained in the Crown until the 22d day of April, 1686, when it passed from the Crown of Great Britain by the Dongan charter. By this charter the fee of the streets, lanes, highways and allies within the city of New York and Manhattan Island, was given and granted to the major, alderman and commonalty of the city of New York “for the public use and service of the said mayor, aldermen and commonalty óf the said city, and of the inhabitants of Manhattan’s Island aforesaid and travelers there together with full power, license and authority to the said mayor, aldermen and commonalty, and their-successors forever, to establish, appoint, order and direct the establishing, making, laying out, ordering, amending and repairing of all streets, lanes, alleys, highways * * * in and throughout the said city of New York and Manhattan’s Island aforesaid, necessary, needful and convenient for the inhabitants *863 of the said city and Manhattan’s Island aforesaid, and for all travelers and passengers there.”
This grant was confirmed by the charter of 1730, known as the Montgomerie charter, and by various colonial and other laws, so that at the time the acts under and by virtue of which the defendant exists were passed, and at the time the structure was erected in front of plaintiff’s premises, the fee of Pearl street, in front of those premises, if not in the plaintiffs, was in the city of New York, “for the public use and service of the said mayor, aldermen and commonalty of said city, and of the inhabitants of Manhattan’s Island, and travelers there.”
Thus, the tenure of the city was not absolute, but was in trust for the purposes mentioned in the grant above-referred to, and conferred no other right or title upon the city than was given by the street-opening acts of 1691, 1787, 1801 and 1813. Story v. N. Y. Elevated R. R. Co., 90 N. Y., 156, 157, Danforth, J.
Now, it frequently has been held that, under the act of 1813, the abutting owner had an easement of light, air and access in and to that portion of the street in front of his premises, and that the taking of' this right to light, air and access is a taking of private property and cannot be done, even for a public use, without compensation. Story v. N. Y. Elevated R. R. Co., 90 N. Y., 156; Cogswell v. N. Y. and N. H. R. R., 103 id., 10, 7 N. Y. State Rep., 203; Lahr v. Met. El. R. R. Co., 104 N. Y., 268; 7 N. Y. State Rep., 870; Abendroth v. The Manhattan Railway Co., 7 N. Y. State Rep., 43.
The Dongan charter gave the streets to the-mayor, etc., “ for the public use * * * of the inhabitants of Manhattan’s Island, and of k'avelers there.”
It seems to me that these words contemplated two kinds of use, or rather, use for two different kinds of persons. One, the use of a traveler, which is the right to pass through the streets; and the other the right to use the streets for all purposes for which streets then were used. One of those rights was the right to build upon or adjacent to the street, so that one might have light and air from and access to the street. This is a right that a traveler, as a traveler, would not have; and it is a right that is protected by the constitution of the state and by the decisions of the courts, as property.
This grant of the streets in the Dongan charter is very much like the covenant in the deed referred to in the Story case, which was “said several streets shall forever thereafter continue and be for the free and common passage of, and as public streets and ways for, the inhabitants of the-said city, and all others passing and returning through or *864 by the same in such manner as the other streets of the same city now are or lawfully ought to be.”
By the Dongan charter and the other acts referred to, the legal estate in the land passed from the state to the mayor, aldermen and commonalty of the city, in trust (see Story case) for the inhabitants of the city, and, therefore, for each inhabitant.
And by those acts the state lost control over the fee of the street, and no longer has any power to change or to modify the existing state of facts without awarding compensation to those who may be damaged by the change.
The consent of the trustee is not sufficient to change the conditions of his trust without the consent of the cestui que trust, because a trustee cannot do any act to the prejudice of his cestui que trust without such consent; and the person who created the trust cannot, without the consent of the cestui que, revoke or rescind the trust.
The case of the Brooklyn Park Commissioners v. Armstrong (45 N. Y., 234), has often been cited as an authority for the proposition that the legislature had power to authorize a municipal corporation to sell property acquired by it under the right of eminent domain for the purposes of a park, without the consent of those whose property had been taken by the city for the park; and particularly that portion of the opinion of Judge Folger, in which that judge says:
“Though the city took the title to the lands by this provision, it took it for the public use as a park, and held it in trust for that purpose. Of course, taking the title, had it taken it also free from such trust, it could have sold and conveyed it away when and as it chose. Receiving the title in trust for an especial public use, it could not convey without the sanction of the legislature * * * It was within the power of the legislature to relieve the city from the trust to hold it for a use only and to authorize it to sell and convey.” And then Judge Folger cites as an authority for this proposition the case of Nicoll v. The N. Y. and Erie R. R. Co. (2 Kern, 121).
This last case is not an authority for the proposition stated by Judge Folger.
The court held in the Nicoll Case, that the railroad company had taken the land in fee, and all that the case decided was that there was a right in the seller or his heirs to re-enter on failure of a condition subsequent, and that this right did not pass by assignment or conveyance of the premises held subject to the condition.
It is also to be noticed that in the Nicoll Case the owner was paid the full value for the land, and the title in the land was vested in the purchaser, and not merely the right to use *865 the land; and though the particular use was abandoned, the title to the property remained in the purchaser free from any restriction.
And so with the other case cited by Judge Folger, viz : the case of De Varaigne v. Fox (2 Blatch. C. C., 95), in which case the fee of the land was taken.
Besides this, these remarks of Judge Eolger were obiter, for the case was not decided upon this point; in fact, while these remarks are in favor of the respondent in the case, still the case was reversed, and a new trial ordered on the ground that the act of the legislature was unconstitutional, because it impaired the obligation of a contract.
I think that these remarks of Judge Eolger are in conflict with the later decisions of the court of appeals in the Story, Cogswell and Lahr Cases, and especially with the remarks of Judge Andrews in the case of Mahady v. The Bushwick R. R. Co. (91 N. Y., 153), in which last case, Judge Andrews says: “That the plaintiff, though an abutting owner simply, the fee of the street being in the city, was entitled to the use of the street, and neither the legislature nor the city could devote it to purposes inconsistent with street uses without compensation, according to the principle of Story v. The Elevated R. R. Co., recently decided.”
Now, if neither the legislature nor the city can devote a street, the fee of which is in the city, to purposes inconsistent with street uses, without compensation, how can they devote Pearl street, which is held in trust for the use of the inhabitants of the city, to purposes which are inconsistent with street uses, without the consent of the persons for whom the street is held in trust, and without compensation P
It has been frequently held that the use of the streets for an elevated railroad is not a use of the street for street purposes.
The defendants also contend that the- plaintiffs have debarred themselves of all right to equitable relief—even though they might have been originally entitled thereto — not only by delay in bringing their action and acquiescence when the circumstances were such as to require them to act if they intended to interfere, but also by their voluntary use, for their own convenience, of defendants’ alleged unlawful structure, and paying defendants for such use for several years before this action was brought, and even since the action was brought.
The evidence shows that the plaintiffs served notice upon the defendants as soon as or about the time they learned that the defendants were about to begin work, but that for some years after the service of such notice, and until the commencement of this action, they did nothing to prevent the defendants from constructing the road.
I do not think that the plaintiffs were obliged to do more than they did. They notified the defendants that the pro *866 posed railroad was an unlawful structure and an encroachment on their rights in the street, and forbid the construction of such road or of any similar railroad through said street. They were not bound before the construction of the road, to obtain an injunction restraining the defendants from commencing the construction of the road.
The defendants knew that the plaintiffs were unwilling to allow the defendants to use their property without compensation.
None of the cases cited by the defendants is an authority for the proposition contended for by the plaintiffs, namely* that an injunction must be obtained before the erection of the thing which is claimed to be a nuisance, ór the person complaining, will be deemed to have acquiesced in the nuisance.
In the Case of Fremont Ferry (6 Nebraska, 18), the plaintiff, by an agreement with the defendant, recognized the right of the defendant to establish and keep a ferry and wagon bridge.
Moreover, none of the authorities cited by the defendants; are controlling in this state.
This same defense has been raised in nearly all of these cases. It was one of the defenses in the Abendroth Case, and was argued before the general term of this court in that case, and although it was not specifically discussed in the opinions of the court, still it was passed upon and determined adversely to the defendants.
Nor is the fact that the plaintiffs used the defendants’road a reason why they should not have equitable relief. Their using of the road worked no injury to the defendants; rather it was a benefit to the defendants, because the defendants received from the plaintiffs the fare charged by them for carrying passengers.
To hold that the plaintiffs, by using the road, had lost their right to complain, would be to make the plaintiffs pay more fare than the defendants were authorized under the? act to demand for carrying a passenger.