RUTH BAXTER *et al. vs.* JOSEPH L. PATENAUDE.

JANUARY 20, 1911.

PRESENT: Dubois, C. J., Johnson, Parkhurst, and Sweetland, JJ.

(1)  *Evidence*.

An answer to an interrogatory is properly ruled out, where it appears that deponent could not have testified to the fact of her own knowledge, and it does not otherwise appear that she was qualified to testify as to such fact.

(2)  *Hearsay Evidence*.

Upon the issue of ownership of the *locus* in an action of trespass and eject- ment, Q. "What do you know about the ownership of this lot?  A. Well, I was always told, my earliest remembrance, that it was grandmother's.  Q. Who told you this?  A. My mother."  It appeared that the grandmother deceased when witness was four years old.

*Held*, properly excluded as hearsay testimony.

(3)  *Evidence*.

"Q. Do you know whether your mother or grandmother or any member of your family, ever drove off trespassers or exercised any dominion or ownership over this land?  A. My grandmother has had plats made, which I have seen, and she has also, so I have always understood, been on and ordered people off."

*Held,* that the question called for personal knowledge and the answer was irresponsive and also objectionable as hearsay.

(4)   *Evidence.   Admission de bene.*

A court sitting without a jury in allowing a qualified admission of papers or records *de bene,* is in the exercise of a reasonable discretion, and where it does not appear that any consideration was given to the evidence so admitted after objection, the exception to such admission will be overruled.

(5)   *Trespass and Ejectment.   Title.*

In 1870, X. caused plats of certain unimproved property to be made and recorded, which plats included the *"locus in quo."* Prior to that time he had fenced in a portion of the property including the *"locus."* Thereafter he staked out lots, graded streets, and posted advertisements on the land and publicly sold house lots and asserted his ownership thereof. There was no evidence that the predecessors in title of plaintiff or any other person sought to interfere with these acts of ownership, until the issuing of the writ in trespass and ejectment 26 years thereafter. Both plaintiff and defendant claimed under paper titles from a common ancestor.

*Held,* that the paper title of the defendant was as good as that of plaintiff, and that such possession of the land as had existed had been upon the part of ancestors in title of the defendant.

(6)   *Taxation.   Notice to Party Holding Interest in Property.*

A tax deed has no binding force against a party whose interest in the property which is the subject of sale appears upon the records, unless the notice required by statute has been given such party in interest.


TRESPASS AND EJECTMENT.   Heard on exceptions of plaintiff, and overruled.


DUBOIS, C. J.   This is an action of trespass and ejectment brought to recover possession of a certain tract of land in Pawtucket, Rhode Island. The death of Ruth Baxter has been suggested on the record and the only plaintiff, who now makes claim to the property in question is Olive Z. Edson. The plaintiff in her declaration alleges that on January 1st, 1890, she was seized and possessed of certain land in said Pawtucket, with improvements thereon, laid out and designated as part of lots numbered 4, 5, and 6 on that plat known as the Edwin Darling plat, which is recorded in the office of the city clerk of said Pawtucket on plat card 143, and bounded and described as follows: Beginning at a point in the southerly line of Rock avenue, one hundred feet east of the easterly line of Mendon

avenue, thence easterly fifty feet and holding that width extends back at right angles to Rock avenue, about one hundred and twelve feet; and that the plaintiff being so possessed, the said defendant afterwards, on the second day of August, 1897, and on divers days between said date and the date of the plaintiff's writ, with force and arms broke and entered upon the premises and with like force and arms ejected the plaintiff therefrom. The defendant pleaded the general issue and the parties entered into a written stipulation that the defendant be allowed to ' show under said plea any matter available under any special plea in bar, provided that notice of what he intended to prove should be given to the plaintiff's attorney at least thirty days before trial. The defendant gave the requisite notice that he would set up adverse possession in himself or his ancestors in title for more than twenty years. Jury trial having been waived, the case was tried before the presiding justice of the Superior Court, who rendered the follow decision:

."Tanner, P. J. This is an action of trespass and ejectment to try title.

"One of the plaintiffs and also the defendant have traced their paper title to descendants of the same ancestor, John Reed, who acquired the land in question under the original allotment. There being no law of primogeniture shown to have existed at the time, we must presume that each of the children of John Reed inherited the land in question. Therefore, it seems to us that the paper title of the defendant is as' good as that of said plaintiff. Such possession as has existed has been on the part of the ancestors in title of the defendant. We do not, however, think it amounts to enough to establish the plea of adverse possession. The plaintiff has, however, in our opinion, failed to show any superior title to that of the defendant.

"As to the tax deed, the tax upon which the deed was given was assessed against the title of the plaintiff, and at that time the ancestor in title of the defendant had his deeds upon record showing his title.

· "We understand that under the statutes of this State a tax

sale levied against one party does not bind another party whose interest is shown upon the record without notice to that party.   We also understand that a tax deed is *prima facie* evidence only of the facts recited in the deed.   We find in the tax deed no recital of any notice to the ancestor in title of the defendant at the time of the sale.

"Such deed is ineffectual as against the defendant.

"Decision for defendant."

Within the time prescribed by law, the plaintiff, Olive Z. Edson, excepted to the foregoing decision and took the necessary steps to maintain a bill of exceptions, and on June 30th, 1910, filed her bill of exceptions, which was subsequently allowed in due course.   The exceptions relied upon are as follows:

"2nd.   To the ruling of the trial justice refusing to admit in evidence questions 41 and 42 put to Lula M. Powers, and her answers thereto, in her deposition in perpetual memory.

"3rd.   To the ruling of the trial justice in refusing to admit in evidence question 63 put to Lula M. Powers and her answers thereto, in her deposition in perpetual memory.

"4th.   To the ruling of the trial justice in refusing to admit the last part of the answer of said Lula M. Powers to question 66 in her deposition in perpetual memory.

"5th.   To the ruling of the trial justice admitting in evidence the defendants' exhibit No. 4. consisting of a certified copy of an action of trespass and ejectment brought by Truman Freeman against Henry W. Charlton, &c.

"6th.   To the finding contained in the rescript that the paper title of the defendant is as good as that of the plaintiff.

"7th.   To the finding contained in the rescript that such possession (of the land in question) as has existed, has been upon the part of the ancestors in title of the defendants.

"8th.   To the finding contained in the rescript that the plaintiffs have failed to show any superior title to that of the defendant.

"11th.   To the finding contained in the rescript that such

deed (the tax deed, plaintiff's Exhibit No.                    ) is
inefficient against the defendant.

"12th.  To the decision of the trial justice in favor of the
defendant, the plaintiff claiming that such decision is against
the evidence and the weight thereof.

"13th.  To the decision of the trial justice in favor of the
defendant, the plaintiff claiming that such decision is contrary
to law."

(1)    The questions and answers referred to in the second ex-
ception are: "Q. 41.  Is the lot of land inventoried in the
inventory accompanying this instrument and therein designated
as 'The Pine Lot on the Great Plains at four hundred dollars'
the same lot of land as the lot of land in dispute in these differ-
ent cases?  A. The pine lot on the great plains is the lot of
land in dispute in these cases.  Q. 42.  Is the Pine Lot on the
Great Plains in dispute in these cases and the Pine Lot of land
mentioned in this instrument, the same lot of land or not?
A. They are."  As it appears, in her deposition, that the in-
ventory referred to was made in a partition proceeding wherein
the petition was dated April, 1 1833, and as it also appears
that at the time of giving her deposition, October 12th, 1908,
Mrs. Powers was but thirty-five years of age, it is manifest
that she was not present at the preparation of the inventory
and cannot testify of her own knowledge what pine lot is
therein referred to, or concerning its location or area, and it
does not appear from her deposition or otherwise in the case
that she was qualified to testify concerning the identity of the
land in dispute with the land so inventoried.  The ruling was
therefore correct.

(2)    The question and answer referred to in the third exception
are: "Q. 63. What do you know about the ownership of
this lot of land?" (Pine lot on the Great Plains)  "A. Well,
I was always told, my earliest remembrance, that it was grand-
mother's."  The next question is: "Q. 64. Who told you
this?  A. My mother."  It also appears in her testimony that
her grandmother died when the witness was four years old.

This was plainly hearsay testimony and was properly excluded by the court.

(3)     The question and answer involved in the fourth exception read as follows: "Q. 66. Do you know whether your mother or your grandmother or any member of your family, ever drove off trespassers or exercised any dominion or ownership over this land? A. My grandmother has had plats made which I have seen, and she has also, so I have always understood, been on and ordered people off." The question calls for personal knowledge and the answer is irresponsive. The last part of the answer is also hearsay testimony and plainly objectionable, on that ground.

(4)     The fifth exception has reference to the ruling of the presiding justice admitting in evidence the certified copy of an action of trespass and ejectment brought by Truman Freeman against Henry W. Charlton. It appears from the record that this was an action for damages for cutting and carrying away wood. The defendant entered the following plea in justification: "I claim to own the land on which the wood charged in the annexed writ was cut belonged to me, to wit, the lot of land described as follows bounded west by a two rod way leading across the plain in Pawtucket on the north by land of George Bucklin, on the east by the old Boston & Newport road and on the south by land of Seba Kent, and that the wood cut on said lot belonged to me, and not to Truman Freeman as he claims. Pawtucket, March 24, 1845, Henry W. Charlton." That case was tried on that issue by referees to whom the case was submitted by the parties under an agreement whereby the award was to be reported to the court of Common Pleas for the county of Bristol, Massachusetts, and the finding of the referees was that "said Charlton did take the wood mentioned in said Freeman's writ and that in so doing he committed a trespass upon said Freeman's property" whereupon they awarded damages for taking the wood and costs and upon said award being reported to the said Court of Common Pleas judgment was entered by said court in favor of said Freeman against said Charlton for said damages and costs.

The plaintiff claims that the admissibility of this very evidence has been passed upon by this court in the case of *Baxter* v. *Brown*, 26 R. I. 381, wherein Douglas, J., speaking for the court, said (p. 382): "The defendant proposes, as a piece of newly discovered evidence, the report of referees, under a rule of court, in an action brought by Truman Freeman against Henry W. Charlton, March 8th, 1845, to recover damages for carrying away one cord of wood. Charlton pleaded that the land on which the wood was cut belonged to him, and described the whole of the Pine Lot, which was the subject of partition between the children of Zelinda Jacobs. Charlton's wife was one of these children, and it is argued that the finding of referees that Charlton was guilty was a finding that Freeman owned the land in question and is conclusive evidence against the plaintiff's title. Such a contention is not sustained for several reasons. In the first place, the referees may as well have found that the wood was not cut upon the land described, as that the land described was the property of Freeman. Next, Mrs. Charlton was not a party to the case, and her title, if she had any, was not concluded by the suit against her husband. Again, the plaintiffs do not claim title through Mrs. Charlton, but from her sister, Ruth Bishop, to whom, and not to Mrs. Charlton, the eastern twenty-six acres of the Pine Lot were set off. Finally, an action of trespass *quare clausum* would not have concluded the title (*Morse* v. *Marshall*, 97 Mass. 519, 522), much less an action of trespass *de bonis asportatis.*" The plaintiff claims that this reasoning is conclusive, even though in the case now at bar, she does in part claim title derived through Mrs. Charlton, her aunt.

The record was not offered in the present case as conclusive evidence against the plaintiff, it was introduced in the following manner: after the counsel for the plaintiff had stated as follows: "I think that is all except our plats and the testimony of our engineer," Mr. Bassett, counsel for the defendant, then addressed the court as follows: "We desire to introduce our testimony and I think we had better put in our paper title, and after we have put in our paper title we will go on to

something else." Then he proceeded to introduce certain exhibits which were respectively numbered,—one, which contained allotments of the proprietors of Rehoboth to various persons including Leonard, Dogget, John Read, Sr., Woodcock and Bowen, Patterson and Matthews. Number two, deed from Daniel Freeman to Truman Freeman. Number three, deed from Remember Carpenter *et al.* to Truman Freeman; he then continued: "Exhibit number four is a certified copy of an action of trespass and ejectment brought by Truman Freeman against Henry W. Charlton, and the copy is a certified copy of the record of the clerk of the Superior Court of the Commonwealth of Massachusetts, which has custody of the files of the late Common Pleas Court, which were by law transmitted to said Superior Court." The transcript then contains the following: "Objected to, admitted *de bene,* and plaintiff's exception noted. Copy of action of trespass and ejectment marked defendant's exhibit 4.". It does not appear anywhere in the transcript, or in the rescript of the court that any consideration was given or weight attached to exhibit No. 4. No harm was done in admitting the same *de bene* for the purpose of further examination and deliberation and it does not appear that any harm has come to the plaintiff from its admission in evidence to the extent that it was. A court sitting without a jury often allows a qualified admission of papers or records *de bene* with the idea of passing upon their admissibility later on in the trial of the case rather than to interrupt the proceedings at the time by hearing arguments for and against the introduction thereof. It seems like the exercise of a reasonable discretion. As there does not seem to be any reason to apprehend that the plaintiff was injured by the introduction of the exhibit the exception will avail him nothing.

(5)     The sixth, seventh, eighth, eleventh, twelfth, and thirteenth exceptions may well be considered together for they are specifications of the claim that the decision is against the law and the evidence and the weight thereof. The decision complained of is contained in the rescript aforesaid.

The plaintiff attempts to trace her title as follows: From John Read, to whom an allotment of land, said to include the land in question, was made under a joint agreement of the inhabitants of Seekonk, Mass., in 1643. John Read married and had children, among whom was Moses, who married Rebecca Fitch and had issue, a daughter Mary Read. In the absence of evidence it may be deemed that John Read and Moses Read each deceased intestate and as no conveyances are found to the contrary it is presumed that Mary Read inherited the land of her father Moses Read. Mary Read married John Bishop and had issue, John Bishop, and she died three weeks after his birth, intestate, and, for anything that appears in the case, without having made any conveyance of the real estate which she inherited from her father. After her death her husband married again and died in the year 1748 testate; his will was duly proved in the same year. There is nothing in his will to indicate that he claimed to own any of the land in suit. He left the "sole improvement" of certain of his real and personal estate to his widow during her natural life with remainder to the one of his three grandsons, children of his son John Bishop, whom his widow should choose to live with her. She made choice of Phanuel Bishop, who married and became the father of three children: Phanuel, William, and Zelinda. Phanuel Bishop Sr. died testate and left his real estate to his three children aforesaid by his will dated in 1810. By a quitclaim deed dated October 3, 1812, Phanuel and William Bishop conveyed to their sister Zelinda Bishop certain lands including "one lot called the Great Plain contents in acres agreeable to our honored Father's deeds be the same more or less." There is no evidence that this deed was ever acknowledged or delivered in the lifetime of any of the persons therein named, and nothing appears in reference to the same until nearly fifty years after the date thereof when, on September 10, 1861, it was "acknowledged in open court" under Mass. Gen. Stats. cap. 89, § 21, by proving the signatures of the grantors and that of one of the subscribing witnesses thereto. Zelinda Bishop married John Jacobs. Their children were Phanuel,

Ruth, Joseph and Zelinda Jacobs. These children made partition of the land on the Great Plains. In the inventory accompanying the petition for partition, dated April 1, 1833, appears: "The Pine Lot on the Great Plains at four hundred dollars." Zelinda Bishop Jacobs married Henry W. Charlton. By deed dated August 4, 1876, she conveyed her interest in these Great Plains "divided to me in my mother's estate" to her niece Olive Zelinda Jacobs, the daughter of her brother Phanuel B. Jacobs. Olive Z. Jacobs married Seth Read Edson and is the plaintiff in this case. Upon failure to pay the taxes on the whole five and a half acres they were sold at public auction and conveyed by Earl S. Binford, Collector of Taxes, to Samuel Shove, by deed dated June 27, 1878. Samuel Shove conveyed the same premises to Olive Z. Jacobs by deed dated February 24, 1880. Whereupon the plaintiff makes the following claim: "The record title to the lot in question in this suit is therefore in the plaintiff, Mrs. Olive Z. J. Edson, through the following line from the original allottee, namely, John Read, Moses Read, Mary Read who married John Bishop, Hon. Phanuel Bishop, his grandson, Zelinda Bishop who married Captain John Jacobs, their daughter Zelinda Bishop Jacobs, who married Henry W. Charlton and conveyed her interest and her deceased brother's, Joseph W. Jacobs, interest to her niece, Olive Zelinda Jacobs, daughter of her brother, Phanuel B. Jacobs, now the wife of Seth Read Edson the plaintiff in this case, who, in further assurance of title, has a deed from Samuel Shove who bought the premises at a tax sale. We submit confidently that the plaintiff presents the better claim thereto, and the stronger and more complete line of documentary evidence." But this claim is followed by this concession: "It may be claimed that there is no evidence of any conveyance from Mary Read, the granddaughter of John Read, who married John Bishop. There is a gap in the records of Rehoboth and we are therefore unable to say, from proof from the records of real estate, that Mary Bishop conveyed this land to her husband;" and thereupon it is argued: "There is a presumption of the existence of deeds that are referred to

in old wills and deeds (*Fletcher* v. *Fuller*, 120 U. S. 534) and this presumption is supported in this case by the fact that these brothers Phanuel and William Bishop thus conveyed to their sister Zelinda Bishop this land, claiming it as part of their father's property."

There is an earlier gap in the plaintiff's title than the one just suggested. It does not appear why Moses Read should be selected by the plaintiff as the sole heir of his father John Read, and no deed or will is presented continuing the title in the land in dispute from John to Moses. But even if we assume that the title did pass from John through Moses to Mary Read, who died three weeks after the birth of her son John Bishop, there is no evidence of any conveyance of the land by her or that she left a will. Even assuming that her husband who survived her had an estate in freehold *jure uxoris* in her real estate, which, upon the birth of his son John Bishop, merged into an indefeasible estate (estate by curtesy) for his own life which he might convey,—see *Martin & Goff* v. *Pepall*, 6 R. I. 92. 95,—nevertheless it was but an estate for life and the remainder in fee was vested in his son John as heir of his mother. The plaintiff, ignoring this condition of affairs, attempts to trace her title through John Bishop Senior by means of his will to Phanuel Bishop, whose children by the quitclaim deed do not rely upon any deed from Mary Read to her husband or upon John Bishop's will in favor of Phanuel but convey "agreeable to our honored Father's deeds," and no deeds to Phanuel are produced. The quitclaim deed itself having been mislaid or secreted or treated as being of no particular consequence for nearly half a century, can not be regarded as a particularly strong link in the chain of title. If the children of Zelinda Jacobs knew of its existence when they petitioned for partition, they did not treat it as having any present value, for it was not acknowledged or recorded for nearly thirty years thereafter.

The defendant also claims that his title to the land in dispute is derived from John Read to whom the land was originally allotted as hereinbefore set forth. That the title was trans-

mitted from parent to child by operation of law as follows:
John Read aforesaid married and had issue, among whom was
John Read his son; the latter married Sarah and had issue,
Timothy, who married Johanna and had issue, Daniel and
Johanna; Daniel Read married Huldah and had issue, Betsey;
Johanna Read married Daniel Freeman and had issue, William
and Daniel, who married respectively Molly and Sarah Horr;
William and Molly Freeman had issue; Welcom Freeman and
Ezra Read Freeman; Daniel and Sarah Freeman had issue;
Truman Freeman. Betsey Read married Remember Carpenter
and had issue; Albert, Remember Read, Sumner and Dwight
Gardner Carpenter. Ezra Read Freeman aforesaid married
Phebe Horr and had issue, Milton Freeman.

The same objections made to the title of the plaintiff will
apply to that of the defendant; why the defendant should
select John Read as the sole heir of his father is no more ap-
parent than the plaintiff's reason for the selection of Moses
Read for the same purpose. If John Read senior died intestate
and, without having disposed of his real estate by deed, it
descended to his heirs at law in equal shares. In addition to
the pedigree hereinbefore referred to the defendant relies upon
the following documentary evidence: a deed from Daniel Free-
man to Truman Freeman dated March 11, 1844, duly record-
ed and purporting to convey all the grantor's right, title, and
interest in and to certain lots of land in Pawtucket on the
Plain which lots were laid out to John Read; deed of Remem-
ber Carpenter and his wife Betsey, Ezra R. Freeman, Welcome
Freeman and Martin Freeman to Truman Freeman, dated
March 11, 1845, and duly recorded, conveying two lots of land
situated in Pawtucket on the Plain, which lots were laid out
to John Read. The certified copy of the action of trespass
and ejectment (hereinbefore referred to); will of Truman
Freeman dated February 8, 1850, probated June 25, 1853, by
which the residue of his estate, after certain pecuniary leg-
acies is given to his son Henry A. and his daughter Mary
A. Freeman, who married John H. Crawford; deed of John H.
and Mary Crawford to Henry A. Freeman, dated May 1st, 1865,

and duly recorded, conveying all her right, title, and interest in and to a tract of land in Pawtucket, bounded on the north by land of Mathews, west by the Mendon road, south by land of Elisha Godfrey and James Farris, and east by the old Boston and Newport road; warranty deed from Henry A. Freeman to Abraham Hunt, dated April 6, 1867, and duly recorded, conveying certain land in Pawtucket commencing at the northwest corner of said Hunt's land on the Mendon road, so-called, and running easterly on land of said Hunt and George Hughes to land of Elisha Godfrey; thence northerly on said Godfrey's land 8½ feet; thence easterly on said Godfrey's land 944 feet; thence southerly on the Godfrey land to the Taunton road; thence easterly on the Taunton road to the Boston and Newport road; thence northerly on the Boston and Newport road 42 feet to land of Thomas Bucklin; thence northwesterly on said Bucklin's land 160 rods to said Mendon road; thence southerly on said Mendon road 368 feet to the first mentioned bound; warranty deed Abraham Hunt to Edwin Darling dated March 1, 1869, and duly recorded, conveying the last described land. Quitclaim deed from George Hughes to Edwin Darling, duly recorded, conveying a certain lot of land in Pawtucket, lying on the Plain and bounded as follows: "Beginning at the northwest corner of said lot, thence running southerly by the Mendon road, so-called, seventy-four feet to a stone set in the ground for a corner, thence easterly four hundred and one feet to said Darling's land, being in a straight line to another stone bound, a corner of land this day sold by said Darling to me, thence westerly to the first bound, the place of beginning, meaning to sell all the land I have north of a line from said stones set in the ground;" warranty deed, duly recorded, from Edwin Darling to Sumner Fifield of lots 4, 5, 6, 7, and 8 on plat No. 2 of house lots belonging to Edwin Darling; mortgagee's deed duly recorded, Sumner Fifield by mortgagee conveying the same lots of land to Lyman M. Darling; warranty deed, duly recorded, of same lots of land from Lyman M. Darling to Mary E. Darling, wife of Edwin Darling; warranty deed, duly recorded, Edwin Darling and Mary E.

Darling his wife, in her right to Joseph L. Patenaude, dated November 9, 1891, and conveying a certain lot or parcel of land with all the improvements thereon, situate in Pawtucket, Rhode Island, and laid out and described as follows, commencing at a point one hundred feet from Mendon road on Rock avenue, thence southerly parallel with Mendon road one hundred and twelve feet, thence easterly on line of land of Joseph J. Fournier fifty feet, thence northerly on line of land of said Fournier one hundred and twelve feet to Rock avenue, thence westerly on Rock avenue, fifty feet, to the first mentioned point, on the E. Darling plat No. 2, on the southerly side of Rock avenue. This is the land in dispute and comprises portions of lots 4, 5, and 6 on the Edwin Darling plat No. 2 hereinbefore referred to.

According to the testimony the first attempt to attract the attention of the public towards the land in question was that made by Edwin Darling, who caused plats of house lots of the same to be made and recorded. The plat which includes the *locus in quo* was entitled: "Plat No. 2, of House Lots belonging to Edwin Darling, surveyed and platted by Cushing & Dewitt, December 1870." Edwin Darling not only caused the land to be platted, but also, before that time, had fenced in a portion of the same, including, as is claimed by the defendant with much plausibility, the land now held by him. Not only that but after platting the land Mr. Darling staked out the lots and plowed and graded the streets, and posted advertisements on the land and publicly sold house lots thereon and otherwise actively and publicly asserted his ownership thereof, and there is no evidence that the predecessors in title of the plaintiff or any other person objected or sought to interfere with him in the exercise of his acts of ownership so openly and conspicuously asserted. The writ in the case at bar is dated August 7th, 1897, more than twenty-six years after said plat was recorded. Since that time numerous houses, a fire station, and a church have been erected upon the land so platted by Edwin Darling.

In these circumstances we are of the opinion that the pre-

siding justice of the Superior Court did not err in his findings that the paper title of the defendant is as good as that of the plaintiff and that such possession of the land as has existed has been upon the part of the ancestors in title of the defendant.

(6) The law governing the sale of land for taxes at the time the five and one-half acres of land, referred to in the deed from Earl S. Binford, Collector of Taxes, to Samuel Shove, dated June 27, 1878, were sold at public auction for non-payment of the taxes thereon, is contained in Gen. Stats. (1872) cap. 41 whereof sections 9, 10, 11, 12, 13, and 15 read as follows:

"Sec. 9.    The collector may advertise and sell any real estate liable for taxes, in the manner hereinafter directed.

"Sec. 10.    In all cases where any parcel of real estate is liable for payment of taxes, so much thereof as is necessary to pay the tax, interest, cost, and expenses, shall be sold by the collector, at public auction, to the highest bidder, after notice has been given of the levy, and of the time and place of sale, in some newspaper printed or published in the town, if there be one, and if there be no newspaper printed in the town, then in some newspaper printed or published in the county, at least once a week for the space of three weeks, and the collector shall also post up notices in two or more public places in the town, for the same period.

"Sec. 11.    If the person to whom the same is taxed be a resident of this state, the collector shall, in addition to the foregoing, cause notice of his levy, and of the time and place of sale, to be left at his last and usual place of abode, or personally served on him, at least twenty days previous to the day of sale.

"Sec. 12.    In case the collector shall advertise for sale any property real, personal, or mixed, in which any person other than the person to whom the tax is assessed has an interest, he shall, provided the interest of such other person appears upon the records of the town, leave a copy of the notice of such sale at the last and usual place of abode, or personally with such other person, if within this state, twenty days prior to the time of such sale.

"Sec. 13. If such other person have no last and usual place of abode within this state, then a copy of said notice shall be sent by mail to such person, at his place of residence, if known, twenty days prior to the time of such sale." . . .

"Sec. 15. The deed of any real estate, or of any interest therein, sold for the payment of taxes, made and executed by the sheriff or collector who shall sell the same, shall vest in the purchaser, subject to the right of redemption hereinafter provided, all the estate, right, and title the owner thereof had in and to such real estate at the time said tax was assessed, free from any interest or incumbrance thereon of any person to whom the notice required by the provisions of this chapter shall have been given; and the recitals in such deed shall be *prima facie* evidence of the facts stated."

As the deed from Sumner Fifield, by mortgagee, to Lyman M. Darling, dated December 9, 1876, hereinbefore referred to, of lots numbers 4, 5, 6, 7, and 8 on "Plat No. 2 of House Lots belonging to Edwin Darling, surveyed and Platted by Cushing & Dewitt, December 1870" was recorded December 16, 1876, and as Lyman M. Darling did not convey any portion of the lot in dispute until March 17, 1890, when he made the conveyance to Mary E. Darling, it is apparent that at the time the collector advertised said property for sale, Lyman M. Darling had an interest therein which appeared upon the records of the town. It does not appear, and it is not claimed, that said collector of taxes gave any notice of the proposed sale to said Lyman M. Darling, and therefore said tax deed has no binding force or effect as against the defendant. The decision of the trial justice is therefore neither against the law nor the evidence.

For the reasons aforesaid the plaintiff's exceptions are overruled, and the case is remitted to the Superior Court with direction to enter judgment for the defendant in accordance with the decision aforesaid.

*Amasa M. Eaton,* for plaintiff.
*Bassett and Raymond,* for defendant.
*R. W. Richmond,* of counsel.