## 𝕾𝖙𝖆𝖚𝖓𝖙𝖔𝖓.

## D. J. Wells, et als,. v. New York Mining and Manufacturing Co., et als.

### September 20, 1923.

### Absent, Kelly, P.

1. Execution and Proof of Documents—*Signature of Subscribing Witness who is Dead.*—When the subscribing witness to a title bond is dead, under the rules of evidence the proof of his signature proves the instrument, whether the paper is an ancient document or not.

2. Execution and Proof of Documents—*Signature of Vendor to Title Bond—Mark—Evidence that Vendor had Signed Deeds.*—In the instant case, an action of ejectment, a title bond was introduced in evidence signed by the vendor. It appeared that the vendor had signed several deeds introduced in evidence by his mark.

   *Held:* That this fact did not discredit the bond, as many old people, who do not write well, prefer to sign by mark. Besides, two of the deeds introduced in evidence showed that they were signed by the vendor about the time he executed the title bond.

3. Ejectment—*Certainty of Proof Required of Plaintiff—Verdict Contrary to the Evidence.*—In the instant case, an action of ejectment, the plaintiffs had not established the location of a patent, under which they claimed, with that degree of certainty which the law required to entitle them to recover, and accordingly a verdict of the jury for the plaintiffs was contrary to the evidence or without sufficient evidence to support it, and the court did not err in setting aside the verdict and rendering judgment for the defendants.

4. Ejectment—*Evidence—Title Bond—Case at Bar.*—In the instant case, an action of ejectment, a title bond from plaintiffs' predecessor in title was held properly admissible in evidence under defendants' grounds of defense, and the defendants could rely on it as an equitable defense to the action, as provided by section 5471 of the Code of 1919. And as such bonds are usually written in a penalty double the amount due by the obligor, and since, under the facts and circumstances shown in evidence, it must be conclusively presumed that the vendee had paid in full, it was immaterial whether the price was $118.00 or $236.00, as shown by the bond.

5. ANCIENT DOCUMENTS—*Title Bond—General Rule.*—A title bond more than thirty years old is properly classed as an ancient instrument, and such instrument proves itself, if free from just grounds of suspicion, and comes from the proper custody, or has been acted upon.

6. EJECTMENT—*Burden of Proof—Case at Bar.*—In an action of ejectment, the burden of proof is on the plaintiffs to establish a legal title to, and a right to the possession of, the land in controversy. In the instant case a careful examination of the maps, in the light of all the facts and circumstances shown in evidence, satisfied the Supreme Court of Appeals that the evidence was not sufficient to warrant the jury in finding that the plaintiffs' location of a certain patent was correct.

7. APPEAL AND ERROR—*Admission of Illegal Evidence—Improper Instructions—Prejudice.*—Upon a writ of error to a judgment of the trial court setting aside the verdict of the jury for the plaintiffs in an action of ejectment, the plaintiffs in error cannot complain of the rulings of the trial court on the admission of illegal evidence, or the giving of improper instructions, where it clearly appears that they have not been prejudiced by such rulings.

Error to a judgment of the Circuit Court of Wise county, in an action of ejectment. Judgment for defendants. Plaintiffs assign error.

*Affirmed.*

The opinion states the case.

*B. H. Sewell* and *Sampson & Sampson,* for the plaintiffs in error.

*Bullitt & Chalkley, R. S. Graham, John Roberts,* and *Fulton & Vicars,* for the defendants in error.

WEST, J., delivered the opinion of the court.

This is an action of ejectment brought by the plaintiffs in error, who are the heirs at law of Jesse Baker, deceased, to recover of the defendants a portion of two certain tracts of land in Wise county.

The jury returned a verdict for the plaintiff for the red shaded portion of the 188 acre patent, and the

larger red shaded portion of the 110 acre patent, as shown on the "court" or "Gardner" map, filed as evidence in the case.

On motion of the defendants, the court set aside the verdict of the jury as to the red shaded part of the 188 acre patent, on the ground that it was contrary to the evidence, and rendered judgment for the defendants therefor, leaving the verdict for the other part standing for the plaintiffs, and rendering judgment for them therefor. The plaintiffs complain of that judgment.

The plaintiffs claim that they hold by a regular chain of title and descent from the Commonwealth of Virginia down to themselves all the 188 acre patent, except that part of said patent lying east of the line established by Patrick Hagan, known on the "court" or "Gardner" map as the "sale line," and except all of that part of said patent lying west of said line, which was conveyed by the Bakers to W. E. Harris and by Jesse Baker to Solomon Wells, and had a right to the possession of all of the 188 acre patent, with the exceptions aforesaid, at the time of the institution of this suit. They also claim by similar title a portion of the 110 acre patent.

The defendants contend that the plaintiffs were not at the time of the institution of the suit, and are not now, vested with any title to the lands sued for, and that the defendants are seized of the legal title of said lands by virtue of deeds duly executed, acknowledged and delivered to the defendants, or those under whom they claim title, and were entitled to the possession thereof at the time of the institution of this suit; that they and those under whom they claim have been in actual, exclusive, open, notorious, continuous and adverse possession of the lands in controversy for more than ten years prior to the institution of this suit; and that in so far as plaintiffs claim the lands in the decla-

ration mentioned, or any part thereof, under Jesse Baker, the defendants rely upon a writing, commonly known as a title bond, executed by Jesse Baker on the 9th day of January 1860 to D. M. Vance under and by which writing Jesse Baker sold to said Vance a certain tract or parcel of land lying in Wise county on the waters of Stone Gap Fork of Powell's river, on both sides of a small branch that ran through said Baker's farm; which said writing was assigned by said D. M. Vance to John Joseph on February 27, 1861, and by said Joseph assigned to John H. Snodgrass on May 27, 1861; and said land was sold by said Snodgrass to A. C. Wells by a written contract dated January 22, 1888; and they rely on the further fact that said Wells, prior to the institution of this suit, released and conveyed all his interest in said tract to the defendant, New York Mining and Manufacturing Company, and that the purchase price for said land was fully paid to said Jesse Baker more than fifty years ago, and possession of the lands described in said title bond was delivered by him to the said Vance, who delivered the possession to the said John Joseph, and who delivered possession to the said John H. Snodgrass, who delivered the same to the vendors of defendants, and that the vendees of said Jesse Baker were more than thirty years ago fully vested with complete equitable, if not legal, title to said lands.

On April 13, 1796, a patent was issued to Justus Barnum for 25,000 acres of land, and on July 13, 1797, a patent was issued to Alexander Wallcott for 50,000 acres of land which covered the Barnum patent.

On November 4, 1832, a patent was issued to Jonathan Baker for 100 acres of land described as follows: "Beginning on a white oak and maple, at the beginning of a flat among rocks, running S. 80 W. 40 poles to a white oak and poplar in the gap of a ridge, N. 32 W. 40

poles to a white oak and poplar in the gap of a ridge, N. 32 W. 40 poles to a Spanish oak and poplar, N. 15 W. 32 poles to a poplar and hickory, N. 30 E. 32 poles to two poplars, N. 73 E. 24 poles to a hickory and chestnut oak, N. 25 W. 32 poles to a poplar and hickory, N. 35 E. 40 poles to two dogwoods, S. 83 E. 18 poles to a white oak and beech, *N. 49 E. 40 poles to a white oak and beech,* S. 68 E. 80 poles, crossing the river to a stake, then S. 21 W. 180 poles to the beginning."

On April 1, 1837, Jonathan Baker conveyed the same 100 acres to Patty, or Martha Stamper.

On July 1, 1853, a patent was issued to Jesse Baker for 110 acres of land.

On June 12, 1858, Martha Stamper conveyed to John B. Cooper the upper, or northern, part of said patent; and also the lower, or southern, part thereof.

On July 1, 1859, Martha Stamper conveyed the middle portion of the 100 acre tract to Jesse Baker.

On January 3, 1860, a patent was issued to John B. Cooper and Jesse Baker for 188 acres, founded upon a survey made June 24, 1857.

All of the junior patents are covered by the Wallcott patent.

Patrick Hagan, under certain mesne conveyances, acquired title to all the lands covered by the Barnum and Walcott patents.

On March 31, 1870, Patrick Hagan conveyed to Jesse Baker 123 acres, more or less, out of the 188 acres covered by the junior patent to Jesse Baker and John R. Cooper, and all of the lands covered by the junior patent for 110 acres issued to Jesse Baker, and Baker thereby acquired both the senior and junior titles from the Commonwealth to said two parcels of land.

Patrick Hagan in his said deed to Jesse Baker made a line through the 188 acres junior patent, running from

two small black oaks and chestnut, on the point of a ridge west of John B. Cooper's house, N. $21\frac{1}{2}$ W. to the north line of said patent, and conveyed by his said deed to said Baker all of the 188 acre patent lying west of said line.

The plaintiffs' location of the Baker and Cooper 188 acre patent and the Baker 110 acre patent, as well as the line west of which Hagan sold out, are all shown by solid red lines on the "Gardner" map (or the "court" map), filed in the case, and the three parts sued for located in the two patents, are the red shaded portions, shown on the plaintiffs' exhibit "Colored Map" attached to the transcript. The fourth shaded portion is the old Jesse Baker graveyard within the 188 acre patent as to which the defendants disclaim.

The defendants' location of these two patents and the Hagan line west of which he sold to Baker are shown by solid yellow lines on the "Gardner" or "court "map.

Patrick Hagan laid no claim to the 100 acres which were patented to Jonathan Baker.

The plat of the survey upon which the 188 acre patent was founded shows that the call "*N. 49 E. 40 poles to a white oak and beach,*" appearing in the 100 acre patent, was left out of the surveyor's report and consequently left out of the 188 acre patent.

After acquiring title to said two tracts of land, Jesse Baker contracted 84.37 acres, a part of the said 123 acre tract to his son, Jeff Baker, and the latter to his brother, Ira Baker, and the two brothers by deed dated June 18, 1889, conveyed said 84.37 acres to one W. E. Harris; and Jesse Baker by deed dated September 20, 1889, released his interest in said tract to said Harris.

On October 30, 1874, Jesse Baker conveyed to Solomon Wells a tract said to contain $104\frac{1}{2}$ acres, same being a part of the 123 acres (which were a part of the

188 acre patent), and a part of the 110 acre Jesse Baker patent. Some of the calls in the deed are as follows: "Beginning at a red oak and small buckeye near the edge of a road, from thence S. 80 W. 40 poles to a poplar and white oak corner Hiram Cooper's line; thence with said line N. 32 W. 40 poles to a Spanish oak and poplar N. 15 W. 32 poles to two poplars; thence N. 73 E. 24 poles to a hickory and chestnut oak on top of a ridge; thence leaving Cooper's line, and running with the top of said ridge N. 47 W., running with the top of said ridge, 20 poles to two small chestnut oaks on top of said ridge; thence with the top of said ridge N. 55 W. 26 poles to two blackgums on top of same ridge; thence with the top of same ridge S. 79 W. 38 poles to a sourwood and chestnut oak on top of same ridge; thence S. 22 poles to a chestnut and maple on same ridge, S. 55 E. 14 poles to a blackgum and black oak; thence with the top of same ridge S. 12 E. 59 poles to a chestnut and black oak; thence S. 2 W. 86 poles to a white oak on top of same ridge, corner Jones' survey."

By title bond dated January 7, 1860, Jesse Baker sold a boundary of his land to David M. Vance who sold to John Joseph, who sold to John H. Snodgrass, who sold to A. C. Wells, who sold and conveyed it to the defendant, New York Mining and Manufacturing Company.

On September 6, 1861, Jesse Baker conveyed to John Baker land described as follows: "Beginning on a chestnut oak on top of the Back Bone ridge, corner of piece of land that the said John Baker bought of Solomon Wells, running eastwardly with the top of said ridge to a red oak, thence north to three lynns near the head of the sugar tree hollow on the bank of a branch, thence westwardly to a white oak on top of the Clay Pinch hill, thence southwardly *with the old patent line of Jonathan Baker to a sourwood and two cucumbers at the river,* and thence to the beginning."

Jesse Baker executed nine other deeds, for small parcels of land, after which it appears that he claimed no other lands, except five and thirty-six hundredths acres on which he resided and which at his death in 1896 descended to his heirs at law, which they, except D. J. Wells, conveyed to John C. Haskell predecessor in title of the defendants, and his interest therein was afterwards sold and conveyed by R. T. Irvine, special commissioner.

The principal questions to be decided are: Was the verdict of the jury for the plaintiffs for the red shaded portion of land, lying within the 188 acre patent, contrary to the evidence, or without sufficient evidence to support it, and did the evidence and the law warrant the action of the court in setting aside the verdict, and rendering judgment for the defendants for said land?

A proper disposition of these questions involves the following inquiry:

Was the plaintiffs' location of the 188 acre patent sustained by the evidence?

By the title bond Jesse Baker sold to D. M. Vance "a tract of land lying and being in the county of Wise, on the waters of the Stone Gap fork of Powell's river on both sides of a small branch that runs through said Baker's farm. Beginning with a conditional line made and agreed on between the said Baker and John B. Cooper, running with a ridge to a chestnut and chestnut oak, thence northwardly to a large chestnut near the top of the *main ridge* (evidently Rogers' ridge); thence running westwardly, *crossing a branch to a gap in the ridge to a chestnut at or near a line of A. & D. Vance's; thence with the top of a ridge southwardly to a conditional line marked and agreed on;* thence eastwardly with the said conditional line to the beginning.

The A. & D. Vance land is shown without contradic-

tion to lie on the western side of and running with the top of that same ridge. This title bond is shown to cover the land north of the Ira Baker tract by the fact that Jesse Baker having, as must be presumed from the recitals in the title bond from J. H. Snodgrass to A. C. Wells, conveyed the land to Snodgrass, took up the title bond and afterwards delivered the same to A. C. Wells so that he would know where to cut the timber. He did cut the timber on all of the land north of the Ira Baker tract all the way up to the northern line of the patent as claimed by the defendants.

[1] There is no room to doubt that this title bond was genuine. Judge Wells, who had been clerk of the court and county judge, and who had seen Jesse Baker's signatures, believes that the one attached to the title bond is the genuine signature of Jesse Baker; and he is positive that the signature of J. H. Snodgrass, the subscribing witness, is the genuine signature of Snodgrass. Snodgrass is dead, and under the rules of evidence the proof of the subscribing witness' signature when he is dead proves the instrument, whether the paper is an ancient document or not. As already stated, the bond is dated January 7, 1860, was assigned to John Joseph February 27, 1861, and assigned by Joseph to John H. Snodgrass May 27, 1861. The bond was acted on by the parties and its authenticity and adequacy in all respects conceded and admitted by the conduct of Jesse Baker and his heirs.

[2] It sufficiently appears that Jesse Baker conveyed the land to Snodgrass and took up the bond, since Snodgrass so declares in his deed to A. C. Wells. The bond was in Baker's possession in 1888, when he gave it to A. C. Wells, who delivered it to his brother, Judge T. G. Wells, who held it eight or ten years. Subsequently it was delivered to Hagan's attorneys. The fact that

Jesse Baker appears to have signed several deeds introduced in evidence by his "mark" does not discredit this bond. Many old people who do not write very well prefer to sign by mark. Besides, one of the deeds introduced in evidence by the plaintiffs and another which the defendants were allowed to show the jury, were executed by Jesse Baker in his own name, about the time he executed the title bond.

When A. C. Wells asked Jesse Baker whether he should buy the land from Snodgrass, Baker told him to buy it, he had no claim upon it. He told Wells to go ahead and cut the timber which he did all the way up from the Ira Baker line. Jesse Baker was frequently around the saw mill, knew where the timber came from and made no objection to its being cut. When T. J. Curran was investigating titles and boundaries for Hagan, Ira Baker, Jesse Baker's oldest son, told him everything had been sold and the Baker heirs did not claim anything up there.

Upon Jesse Baker's advice A. C. Wells bought the land from John H. Snodgrass and took from him a title bond. By this bond Snodgrass sold A. C. Wells, "a tract or parcel of land situated in Wise county, on the waters of Stone Gap fork of Powell's river, on a branch that runs down through the old farm of Jesse Baker, it being the same land sold by the said Jesse Baker to D. M. Vance, and afterwards purchased by me, for which the said Jesse Baker made to me his deed."

In 1888 and 1889, there was great activity in the buying and selling of coal and coal lands in that vicinity. Yet neither Jesse Baker nor his heirs, until the institution of this suit, ever made any claim to the land in controversy.

It is observed that the title bond runs for two of its calls with the ridge that lies east of the Baker branch to

a chestnut and chestnut oak, thence northwardly to a large chestnut near the top of the main ridge, before it turns westward, "thence running westwardly, crossing a branch to a gap in the ridge to a chestnut at or near a line of A. and D. Vance." Thence, "southwardly with the top of the ridge to a conditional line marked and agreed on, thence eastwardly with said conditional line to the beginning.

Jesse Baker must have known the corners to his own land, which was surveyed less than three years before he gave the title bond, and in locating the western boundary, in the bond, along the top of the ridge he was evidently *following his western boundary* in the 118 acre patent. It is unbelievable that he intended to reserve to himself a narrow strip of land on the western side of the ridge, entirely disconnected from his other lands.

[3] Applying the foregoing and other facts which appear in the record to the "court" map, it seems certain that the plaintiffs have not established the location of the 188 acre patent, in accordance with the red line survey, with that degree of certainty which the law requires to entitle them to recover the land shown on the red shaded portion of that map.

[4] We find no merit in the proposition of the plaintiffs that the title bonds were not admissible in evidence, and that the defendants cannot rely on them as an equitable defense to this action of ejectment, as provided by statute. Code, section 5471. They were admissible in evidence under defendants' grounds of defense.

Plaintiffs rely largely on *Davis* v. *Teays*, 3 Gratt. (44 Va.) 283. This case was decided under a statute differing materially from the one now in force, which has been in effect since 1849. The old statute required the defendant to *produce plain, written evidence*, stating the purchase and terms thereof, while the present statute

(Code 1919, section 5471) says in effect that "where there is a writing," its contents may, where the same is lost, be proved without producing the writing.

In the instant case, however, the original title bond was *produced*, and shown to be genuine and in proper custody and acted on by the parties. The bond itself is a sufficient statement of the "purchase and terms thereof."

Such bonds are usually written in a penalty double the amount due by the obligor; but whether the price was $118.00 or $236.00 is immaterial, since, under the facts and circumstances shown in evidence, it must be conclusively presumed that the vendee has paid the full amount contracted to be paid, and that he, or those claiming under him, are entitled to a conveyance of the legal title to such land from the vendor, without condition. It follows that plaintiffs cannot recover against the defendants any land so sold under the title bond and that the verdict of the jury is plainly wrong in giving such land to the plaintiffs.

[5] The title bonds being properly classed as ancient instruments, the instruments themselves were sufficient proof.

In 1 Greenleaf (15th ed.), sec. 570, p. 713, we find this: "Ancient instruments prove themselves. To this rule, requiring the production of the subscribing witnesses, there are several *classes of exceptions*. The *first* is, where the *instrument is thirty years old;* in which case, as we have heretofore seen, it is said to prove itself, the subscribing witnesses being presumed to be dead, and other proof being presumed to be beyond the reach of the party. But such documents must be free from just grounds of suspicion, and must come from the proper custody, or have been acted upon, so as to afford some corroborative proof of their genuineness. And, in this

case, it is not necessary to call the subscribing witnesses, though they be living. This exception is coextensive with the rule applying to ancient writings of every description, provided they have been brought from the proper custody and place; for the finding them in such a custody and place is a presumption that they were honestly and fairly obtained and preserved for use, and are free from suspicion of dishonesty. But whether it extends to the seal of a private corporation has been doubted, for such a case does not seem clearly to be within the principle of the exception."

In *Carter* v. *Robinett*, 33 Gratt. (74 Va.) 429, this is said: "But whilst it cannot be relied on by the defendants, it may be said that still the copies of unrecorded or illegally recorded deeds cannot be given in evidence by the plaintiffs. That may be conceded; but here an obligation is shown on the part of Richard Smith, by his own acknowledgment, to convey to De Tubeuf, his heirs or assigns, the land in dispute, if it is not an acknowledgment that he had conveyed it. But, although it may not be an acknowledgment of a conveyance, and no actual conveyance has been shown, after such a lapse of time, in ejectment, the court would, under all the circumstances of the case, instruct the jury to presume that a conveyance had been made. And if the court should so instruct the jury in a case where the court is in the place of a jury, and discharging its functions, it ought so to presume itself."

The syllabi in *Fletcher* v. *Fuller*, 120 U. S. 534-555, 7 Sup. Ct. 667, 30 L. Ed. 759, state the law thus:

"1. When the possession and use of real property have been long continued, they create a presumption of lawful origin; and this presumption does not always proceed on a belief that the thing presumed has actually taken place.

"2. The presumption of a grant is indulged merely to quiet a long possession which might otherwise be disturbed by reason of the inability of the possessor to produce the muniments of title, which were actually given to him or those under whom he holds, but have been lost, or which he or they were entitled to have, but neglected to obtain, and of which the witnesses have passed away, or their recollection of the transaction has become dimmed and imperfect.

"3. Though a presumption of a deed is one that may be rebutted by proof of facts inconsistent with its supposed existence, yet where no such facts are shown, and the things done and the things omitted, with regard to the property in controversy, by the respective parties, for long periods of time after the execution of the supposed conveyance, can be explained satisfactorily only upon the hypothesis of its existence, then the jury may be instructed that it is their duty to presume such a conveyance, and thus quiet the possession.

"4. In the case presented, it is held that the claim to the lands in controversy by the defendants and their ancestors in title for over a century, with the payment of taxes thereon, and acts of ownership suited to the condition of the property, and its actual use for thirty-six or twenty-eight years would justify a presumption of a deed to the original ancestor to quiet the title of the defendants claiming under him; and that an instruction to the effect that in order to presume a lost deed the jury must be satisfied it had actually existed, was error."

In Best on Evidence, vol. 2, p. 849, we find this: "The next instance in which this rule is relaxed seems to rest even more exclusively on the principle of necessity, namely: that of ancient documents * * (which) are receivable as evidence of ancient possession in favor of

those claiming under them, and even against others who are neither parties nor privies to them. The proof of ancient possession is always attended with difficulty. Time has removed the witnesses who could prove said acts of ownership of their own personal knowledge and resort must be necessarily had to written evidence."

In *Sparhawk* v. *Bullard*, 1 Metc. (Mass.) 95, 101, the court said: "Recitals in ancient deeds are always competent evidence, and are presumed to be true, *unless the contrary can be made to appear.*"

J. R. Gardner surveyed the Ira Baker tract in 1888 or 1889, and in his notes of that survey he has the call shown on the map "N. 10.45 E. 454.6 feet." This line appears to have been left out of the deed. There is no call in the deed of "N. 43.40 W. 1,120 feet," and it is not, and should not appear on the map as, the Ira Baker line. The call N. 62.15 W. 786.5 shown on the maps and in the deed as connecting "two small chestnuts" on one side of the branch with the two spotted oaks on top of the ridge at defendants' station No. 9 yellow, is the true Ira Baker line according to both the survey and the deed. The known objects mentioned in the deed and on the map show that the Ira Baker line ran from "a maple and small chestnut tree" to "two small chestnuts" the call connecting the two stations by a straight line being omitted from the deed. It follows that the verdict of the jury is erroneous in giving the plaintiffs the triangle south of the true boundary line of the 83.37 acre tract conveyed by Ira Baker and others to W. E. Harris.

It appears from an inspection of the location of the 188 acre patent on the court map that the western boundary, in red, runs away from, on the west side of, and about parallel with Cooper's ridge, while the western boundary, in yellow, follows the top of this ridge.

Both maps were made by competent surveyors and there is evidence that each survey follows the calls contained in the patent, which in some instances run to natural objects. In some cases the location of natural objects referred to in the calls is supported by oral testimony. Frequently on account of the lapse of time and the cutting and removal of timber, or other causes, the trees mentioned in the calls could not be located.

The survey of the 188 acre patent was made in 1857. Jesse Baker and John B. Cooper then owned the 100 acre patent which Jonathan Baker secured in 1832, Baker owning the middle portion and Cooper the upper and lower ends thereof. It is to be presumed that they did not include any portion of the 100 acre patent in the 188 acre patent. Yet, according to the plaintiffs' contention as to the location of the 188 acre patent it would run into and lap on the 100 acre patent. The record shows that the dividing line between Jesse Baker and John B. Cooper ran up the ridge east of the Baker branch. Presumably they had divided the 188 acre patent of which they were joint owners. But if the plaintiffs' location of this patent is correct, they ran the division line almost entirely outside of the patent. It appears from deeds made by many coterminous landowners during the lifetime of Jesse Baker, and presumably with his knowledge, that the grantors conveyed land which had for its eastern boundary line the top of the same Cooper's ridge. Plaintiffs' survey does not include the *double chestnut oak* at defendants' station No. 14, which is shown beyond doubt to be one of the corners called for in the 188 acre patent. The same is true of other corners mentioned in the patent. To discuss the evidence as to all the calls and natural objects referred to in the two surveys as corners, in detail, would unduly prolong this opinion, and, in our view, prove unprofitable.

[6] The burden was on the plaintiffs to establish a legal title to and a right to the possession of the land in controversy. A careful examination of the maps, in the light of all the facts and circumstances shown in evidence, satisfies us that the evidence was not sufficient to warrant the jury in finding that the plaintiffs' location of the 188 acre patent is correct.

[7] This being a writ of error to a judgment of the trial court setting aside the verdict of the jury, the plaintiffs in error cannot complain of the rulings of the court on the admission of illegal evidence, or the giving of improper instructions, since it clearly appears that they have not been prejudiced by such rulings. *White v. White*, 129 Va. 621, 106 S. E. 350.

We need not consider further the assignments of error, as the questions we have discussed are decisive of the case.

The verdict of the jury was plainly contrary to the evidence and without sufficient evidence to support it, and the trial court was fully warranted in setting the same aside.

Upon the evidence, the judgment complained of is right and will be affirmed.

*Affirmed.*